IT&S OF IOWA, INC., AND IOWA TRUST AND SAVINGS BANK, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 10741-88.        Filed November 12, 1991.

*Philip C. Cook, Terence J. Greene,* and *Timothy J. Peaden,* for the petitioners.

*Anne Hintermeister, William H. Stoddard III,* and *Patricia A. Donahue,* for the respondent.

WELLS, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1972 | $6,703 |
| 1974 | 75,008 |
| 1979 | 1,241 |
| 1984 | 77,252 |

After stipulations by the parties, the issues remaining in the instant case relate to petitioners' entitlement to depreciate, under section 167,[1] the value of a core deposit intangible asset acquired in the purchase of another bank. The issues we address are: (1) Whether petitioners have established that the core deposit intangible of the acquired bank has an ascertainable value separate and distinct from goodwill; (2) whether petitioners have proved that the core deposit intangible has a limited useful life; (3) whether the values and amortization schedules utilized by petitioners in calculating their depreciation deductions with respect to the core deposit intangible are reasonable; and (4) whether petitioners may amortize the core deposit intangible on an accelerated basis.

## FINDINGS OF FACT

Some of the facts and certain documents have been stipulated for trial pursuant to Rule 91. The stipulated facts are incorporated in this opinion irrespective of any restatement below. Petitioners are Iowa corporations, and their principal business is commercial banking. At the time the petition in the instant case was filed, petitioners' principal place of business was located in Oskaloosa, Iowa.

In April or May of 1981, petitioner[2] learned that the First State Bank of What Cheer (What Cheer bank) was for sale because its controlling stockholder and manager, Mrs. Dorothy Baylor, wished to retire. The What Cheer bank is located in the small town of that name some 20 miles from

---

[1]Except as otherwise noted, all section references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]The term "petitioner," as used herein, refers to Iowa Trust & Savings Bank (Iowa Trust). IT&S of Iowa, Inc. (IT&S) is a party to the instant case because it filed a consolidated return with Iowa Trust for the taxable year 1984. IT&S was incorporated on July 26, 1983, after the transaction in issue in the instant case, and became the parent of Iowa Trust by acquiring 88.4 percent of Iowa Trust's stock.

petitioner's main office in Oskaloosa. At such time, What Cheer, Iowa,[3] was a small rural community with a population of approximately 800 residents, who generally worked outside of the town, primarily in agricultural occupations. The What Cheer bank was the only bank in What Cheer. Fourteen other banks and banking offices were located within a 25-mile radius of What Cheer. At such time, petitioner's assets exceeded $40 million, while the assets of the What Cheer bank totaled about $7.5 million.

Petitioner considered the What Cheer bank an attractive acquisition prospect. It had above average earnings, a good reputation in the community, stable and loyal customers who were local residents, good management, a good location, and was experiencing growth in deposits. Approximately 25 percent of the bank's assets consisted of loans, while the remainder was made up of high quality securities. The bank had no bad loans. Furthermore, under Iowa bank regulatory policy, the only way that petitioner could have established an office in What Cheer was to acquire the What Cheer bank.

The prospect of marketing banking services to the customers of the What Cheer bank was another attractive feature of the acquisition. Petitioner desired to expand the number of banking services available to customers of the What Cheer bank by offering additional trust services, expanded access to loans, individual retirement accounts, and Keogh plans. Petitioner desired to have its customers use as many of its services as possible.

Upon learning of the availability of the What Cheer bank, petitioner's president contacted a banking consultant to assist in arriving at a price for the bank and obtaining regulatory approval for the acquisition. After an initial offer by petitioner was rejected, Mrs. Baylor, in June 1981, informed petitioner of the price she considered acceptable.

To decide whether to pay the asking price, petitioner's president met with the banking consultant and a representative of an outside accounting firm. They considered the earning potential of the What Cheer bank by comparing its

---

[3]As far as we can tell, the name "What Cheer" was taken from the greeting given to Roger Williams by Narragansett Indians when he arrived from Massachusetts to found the settlement of Providence, Rhode Island, and the town was so named by a former resident of Providence who moved to Iowa in the mid-19th century.

cost of funds against projections of historical earnings, as well as its core deposits. Petitioner also considered that none of the target bank's deposits consisted of "hot money," defined as deposits highly sensitive to interest rate changes, which enhanced the value of the What Cheer bank to petitioner.

The group also discussed the concept of the core deposit intangible asset and whether the value of the What Cheer bank's core deposits could be booked as part of its regulatory capital in order to meet the capital adequacy requirements set by Iowa banking regulators, as well as whether the core deposit intangible could be amortized for tax purposes. A rough estimate of the value of the core deposit intangible was used in assessing whether to purchase the bank at the asking price, but no attempt was made to study the interest rate sensitivity of the core deposits or to perform a study to value the core deposit intangible at such time. The outside accountant advised petitioner that a study valuing the core deposit intangible would be needed to sustain a tax deduction based on amortization of the core deposit intangible. Based on all of such factors, petitioner and its advisers concluded that the transaction would be profitable at the price asked by Mrs. Baylor and decided to accept her offer.

Mrs. Baylor, however, did not want to wait until petitioner completed the lengthy process of obtaining regulatory approval for the acquisition before selling her bank. Consequently, petitioner's president, one of its directors, and the banking consultant were authorized by petitioner's board to purchase the stock of the What Cheer bank. Petitioner agreed to purchase the bank stock from them at the price they had paid for it, plus any interest costs incurred in carrying such stock, contingent upon receipt of approval for the acquisition from the Iowa Department of Banking and the Federal Deposit Insurance Corporation (FDIC). No adjustment of such amount on account of changes in the value of the What Cheer bank's stock while it was held by the three individuals could be made under the agreement. If the requisite approvals had not been obtained, the three individuals would have continued to own the What Cheer bank.

Pursuant to such plan, on July 16, 1981, the three individuals agreed to purchase the stock of the What Cheer bank from Mrs. Baylor and the other stockholders for a sum equal to two times the book value of the capital, surplus, and undivided profits of such bank at the time such sale was settled. The book value of the What Cheer bank stock was $961,500 as of the date of the purchase. The three individuals financed the purchase of the What Cheer bank with a loan from a bank in Des Moines at the prime rate.

On May 12, 1982, petitioner and the three individuals entered into a sale agreement calling for the stock of the What Cheer bank to be sold to petitioner under the terms of their prior arrangement. The agreement provided for allocation of the purchase price among various assets, including goodwill; however, no amount of the price was allocated to a separate core deposit intangible asset. Subsequently, petitioner undertook the task of obtaining regulatory approval for the acquisition of the What Cheer bank, filing the required applications with the Iowa Department of Banking on April 12, 1982, and the FDIC on May 29, 1982.

Petitioner sought approval from the FDIC and the Iowa Department of Banking for recording the core deposit intangible asset to be obtained in the acquisition of the What Cheer bank. At such time, the FDIC had stated, in BL-5-82, issued March 5, 1982, that it would allow, on a case-by-case basis, the recording of an acquired core deposit intangible as an asset. The FDIC permitted such booking because it viewed the core deposit intangible as an asset and considered that its amortization was necessary to avoid distorting a bank's income. The core deposit intangible is also treated as an asset under generally accepted accounting principles (GAAP).

Petitioner's outside accounting firm conducted a preliminary study valuing the core deposit intangible at $1,080,611. The FDIC rejected such figure on the ground that it included certificates of deposit in the deposit core, contrary to FDIC guidelines. The FDIC only considered demand and savings accounts to be core deposits. The FDIC would not accept the inclusion of such deposits in the core even though petitioner could show that such deposits were

stable. Petitioner's outside accountants subsequently figured the value of the core deposit intangible without including certificates of deposit at $613,120.

The FDIC, however, would not approve petitioner's request to book the core deposit intangible unless Iowa bank regulators also allowed it to be booked. At a hearing on its application, petitioner attempted to persuade the State regulators to allow booking of the core deposit intangible and to have it considered as part of its regulatory capital. Including the core deposit intangible in regulatory capital would have enabled petitioner to meet the capital adequacy requirements of the State banking department without raising additional capital, but its exclusion would have left petitioner $600,000 short of the level of capital required to obtain approval of the proposed acquisition.

Ultimately, the Iowa Department of Banking was not willing to recognize the core deposit intangible as a separate asset, and, in approving the acquisition, ruled that petitioner had to meet the capital adequacy requirement without counting a core deposit intangible. Iowa bank regulators required petitioner to subtract the premium paid for the What Cheer bank from undivided profits and write it off immediately. When the Iowa banking department issued its ruling, petitioner dropped its effort to have the core deposit intangible approved by the FDIC. In order to raise the additional capital, petitioner subsequently issued $800,000 of preferred stock, paying dividends at the prime rate, to its banking consultant, who financed the purchase with a loan at the prime rate from a Des Moines bank. The stock was redeemed in 1984.

On April 18, 1983, the FDIC approved petitioner's application to acquire the What Cheer bank, but required that the entire amount of the premium paid be subtracted from undivided profits and written off immediately. On May 20, 1983, petitioner purchased all of the stock of the What Cheer bank, paying the three individuals $1,931,075 in cash and assuming liabilities of $7,870,300. All of the What Cheer bank's assets were acquired and all of its liabilities were assumed by petitioner. Petitioner filed a valid election under section 338(g) to treat the acquisition of the stock as a deemed purchase of the assets of the What Cheer bank.

Immediately after purchasing the shares, petitioner liquidated the What Cheer bank pursuant to section 332. After such liquidation, petitioner operated such bank as a branch, offering an expanded array of banking services to its customers.

Petitioner's outside accounting firm conducted a study to determine the value of the core deposit intangible on the date that petitioner acquired the What Cheer bank. The accountants concluded that the deposit core was an asset separate and distinct from goodwill because it could be valued and it had a determinable life.

The accountants valued the core by means of the cost savings method, under which the value of the core is determined as the amount of savings achieved by funding assets with the core instead of an alternative funding source. The study valued only the cost savings afforded by the deposit core and did not include the value of the What Cheer bank's other customer relationships. The accountants used only information available as of the date of the acquisition to determine the value of the deposit core.

The first step in the methodology was to define the deposit core. Petitioner's accountants considered core deposits to be funds which were stable and cost less than the alternative funding source identified by the accountants. Under such standard, all deposits of the What Cheer bank, excepting only government funds, internal accounts, and certificates of deposit over $100,000, i.e., "hot money," were considered core deposits. No deposits were excluded from the core on the basis of interest rate sensitivity. The deposit core was not reduced by reserves or for the float on uncollected balances, neither of which are available for use by a bank. The accountants calculated the amount of core deposits in the What Cheer bank on the acquisition date to be approximately $7,229,086. The accountants included the following deposits in the core:

Table A

| Account type | Amount | Percentage of total |
|---|---|---|
| Demand | $749,341 | 10.4% |
| NOW[4] | 189,868 | 2.6 |
| Super NOW | 693,516 | 9.6 |

[4]The acronym "NOW" stands for "negotiable order of withdrawal."

*Table A*

| Account type | Amount | Percentage of total |
|---|---|---|
| Regular savings | 369,916 | 5.1 |
| Certificates of deposit | 4,159,595 | 57.5 |
| Money market | 1,066,849 | 14.8 |
| Total | [5]7,229,086 | 100.0 |

The deposits of the What Cheer bank, however, were not entirely insensitive to interest rate changes. The call reports which the What Cheer bank filed with the FDIC between 1978 and 1983 showed its deposits were migrating from low yielding demand and savings accounts to higher yielding certificates of deposit. The accountants then determined the cost of the core deposits, calculating the amount of interest and maintenance costs incurred by the What Cheer bank. The core's maintenance costs, which are the expenses incurred by a bank in providing services to its customers, were determined by having the What Cheer bank's management allocate such expenses between the deposit and other functions of the bank. The cost of Federal deposit insurance was included in figuring the core's maintenance cost. Based on the expense allocation, over half of all of the What Cheer bank's overhead expenses were allocated to the deposit base. Maintenance costs vary by account type, with demand accounts having the highest costs, even after service fees are considered.

Petitioner calculated the deposit core maintenance cost as follows: petitioner took its 1982 operating expenses and allocated them between the core and other functions of the bank. Petitioner concluded that, after netting out service fee income, the total expense allocable to the deposit core was $89,969. Petitioner calculated that such figure equaled 1.284 percent of the $7,009,611 average balance of deposits of the type included in the core outstanding on December 30, 1982. Of such deposit total, $1,353,599 was attributable to demand and NOW accounts, and $838,683 was attributable to regular savings accounts. Maintenance costs were assumed to remain constant over the life of the core, even as the core shrank.

The accountants calculated the interest cost of the core using the rates actually paid by the What Cheer bank on its

---

[5]Sum of figures for account types may not equal total due to rounding.

accounts at the date of the acquisition. Interest rates paid on each type of deposit at the time of the acquisition were as follows:

*Table B*

| Account type | Average rate |
|---|---|
| Demand | 0.00% |
| NOW | 5.25 |
| Super NOW | 8.50 |
| Regular savings | 5.25 |
| Certificates of deposit | 10.39 |
| Money market deposit accounts | 8.50 |

The weighted average interest rate of the deposit core, which petitioner's accountants calculated based on the relative percentage of each type of deposit within the core, was 8.454 percent.

In order to take into account the effect of banking deregulation on interest costs the accountants projected that interest rates paid on the core would rise in equal stages between 1983 and 1986,[6] approaching the rate they projected would be paid on U.S. Treasury bills as of such time, on the basis of the yield curve for U.S. Treasury debt issues as of the date of the acquisition, and thereafter would remain at 1 percentage point below such rate over the life of the deposit base. Petitioner's accounting firm projected that the interest cost of the deposit core would be 9.523 percent during 1986 and beyond.

Bank deposits may be withdrawn at the will of the depositor. Inasmuch as core deposits do not remain with a bank indefinitely, but eventually leave for a variety of reasons, the accountants measured the life of the What Cheer bank's deposit core. They calculated such life by reference to the rate at which accounts within the core were closed; such rate was then applied to the amount of deposits projected to remain with the bank in each succeeding year, thus determining the runoff of the core. The accountants did not stratify the accounts by age or size because the number of closed accounts was too small to produce meaningful results.

---

[6]1986 was the year in which, under the Depository Institutions Deregulation Act of 1980, Pub. L. 96-221, 94 Stat. 143, interest rate ceilings on all nondemand accounts were to be removed.

Different periods were used to determine the runoff rates for the various account types. For the demand/NOW account and money market categories, attrition rates were established by sampling accounts closed during a 1-year period ending April 30, 1983. Account closings between 1979 and 1982 were studied in order to determine attrition rates for regular savings accounts and time certificates.[7] The rate used in the study for each category of deposits was an average of the attrition rates calculated with respect to such category for each year studied. The accountants developed the following attrition rates for each type of deposit:

*Table C*

| Deposit type | Attrition rate | Amount of deposits |
|---|---|---|
| Demand/NOW | 3.74% | [8]$1,632,726 |
| Regular savings | 7.61 | 369,916 |
| Time certificates | 6.20 | [9]2,654,021 |
| Money market | 13.40 | 2,572,423 |

The accountants predicted that, based on the runoff rates calculated in the study, the deposit core had a useful life of 26.75 years. The end of the deposit core's useful life was fixed at the point where 98 percent of its value had been realized.

The accountants then sought to measure the savings afforded by the core deposits by comparing the core's cost against that of an alternative funding source. The alternative selected was an issue of petitioner's unsecured debt equal to the amount of core deposits on the date of the acquisition and having a maturity and runoff equal to the life of the deposit base. In selecting such alternative, the accountants did not consider the alternative sources of funds actually used by petitioner. At the time of the acquisition, petitioner used deposits to fund its assets. The

[7] The longer study period was used in order to investigate the relationship between the rate of account closings and changes in market interest rates. Based on a comparison of account closing rates and interest rates in the years studied, the accountants concluded that there was no relationship between the two.

[8] Figure is the sum of demand, NOW, and super NOW account balances shown in table A.

[9] For purposes of determining deposit core attrition, money market certificates equaling $1,505,574 were reclassified from the certificate of deposit category to the money market category, accounting for the difference between the total shown for the certificate of deposit category on the instant table and the amount shown on table A.

accountants did not compare the What Cheer bank's cost of funds to that of its peer group, not believing it relevant to the valuation of the deposit core.

An investment bank in Chicago informed petitioner that such a debt issue would bear an interest rate of 13 percent, but that the availability of a market for such an issue could not be guaranteed. The alternative funding source did not have Federal deposit insurance, while the core deposits did.

The accountants figured the cost savings of the deposit core as the difference between the interest and maintenance costs of the deposit core and the interest cost of the hypothetical debt issue in each year of the deposit core's useful life. The accountants reduced the amount of such stream by 48.7 percent, representing the combined effect of Federal, State, and local income taxes, in order to determine the net amount of savings produced by the core.

The accountants then calculated the present value of such stream of savings as of the date of the acquisition by applying a discount factor to each year's projected savings. The discount factor was determined as a weighted average of petitioner's cost of debt and equity capital. To figure the cost of debt capital, the accountants multiplied 6.669 percent, which was the after-tax interest cost of the 13-percent rate quoted on the hypothetical debt issue, by 92.5 percent, the portion of petitioner's assets funded by debt, i.e., deposits. To figure the cost of equity capital, the accountants multiplied 7.5 percent, the portion of petitioner's assets funded by equity, by a 20-percent "desired after-tax return." The discount rate resulting from summing the two figures was 7.667 percent, which was applied to the stream of cost savings to calculate its present value.

In discounting the stream of cost savings by such rate to calculate the present value in 1983 of each future year's cost savings attributable to the deposit core, the accountants also figured in the tax savings to be realized from amortizing the deposit core in each year of its life, thus arriving at the final value for the core. Without considering tax savings, the value calculated for the core was $581,490. When the tax savings were included, the value of the What Cheer bank's deposit core increased to $906,470. The accountants added the cost of the study, $32,079, to such

value in order to arrive at the total amount subject to amortization, which equaled $938,549.

The present value of each future year's cost savings, determined as of 1983, together with a portion of the cost of the study, would be deducted from such year's income to amortize the core. Due to the effect of discounting, the deposit core's value wastes on an accelerated basis, so the amortization schedule is accelerated.

Petitioner used the residual method to allocate the purchase price of the What Cheer bank among the assets purchased in the acquisition. After making allocations among the identified assets of its target, including the core deposit intangible, petitioner allocated the residue of the price, $229,512, to goodwill.

## OPINION

The questions presented in the instant case arise out of our opinion in *Citizens & Southern Corp. v. Commissioner,* 91 T.C. 463 (1988), affd. without published opinion 900 F.2d 266 (11th Cir. 1990). The cases relied upon by the Court in deciding the core deposit amortization issue are set forth in detail in *Citizens & Southern* and do not bear repeating in the instant case.[10] We therefore will turn directly to the arguments presented by the parties in the instant case.

To qualify for a depreciation deduction, petitioners must show that the deposit core acquired from the What Cheer bank (1) had an ascertainable cost basis separate and distinct from the goodwill[11] and going-concern value[12] of such bank, and (2) had a limited useful life, the duration of which could be ascertained with reasonable accuracy. *Donrey, Inc. v. United States,* 809 F.2d 534, 537 (8th Cir. 1987); *Houston Chronicle Publishing Co. v. United States,*

---

[10]See also *Colorado National Bankshares, Inc. v. Commissioner,* T.C. Memo. 1990-495.

[11]Goodwill is the "expectancy of continued patronage, for whatever reason." *Boe v. Commissioner,* 307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961). It is a "preexisting business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely." *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 233 (1975).

[12]Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern," *VGS Corp. v. Commissioner,* 68 T.C. 563, 591 (1977); *Conestoga Transportation Co. v. Commissioner,* 17 T.C. 506, 514 (1951), and it is manifested in the business' ability to operate without interruption and to continue generating sales after an acquisition. *Computing & Software, Inc. v. Commissioner,* 64 T.C. at 235.

481 F.2d 1240, 1250 (5th Cir. 1973); *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 479. Whether such requirements have been met is essentially a question of fact. *Donrey, Inc. v. United States,* 809 F.2d at 536; *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 479.

As the instant case presents issues of a technical nature, both parties have relied heavily on expert opinions and testimony in presenting their respective positions concerning the existence and value of the core deposit intangible. We evaluate each expert's opinion in the light of such expert's demonstrated qualifications and all other evidence. *Parker v. Commissioner,* 86 T.C. 547, 561 (1986); *Johnson v. Commissioner,* 85 T.C. 469, 477 (1985). We are not bound, however, by the opinion of any expert witness where such opinion is contrary to our judgment. *Estate of Kreis v. Commissioner,* 227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court. While we may accept the opinion of an expert in its entirety, *Buffalo Tool & Die Mfg. Co. v. Commissioner,* 74 T.C. 441, 452 (1980), we may be selective in the use of any portion of such an opinion. *Parker v. Commissioner,* 86 T.C. at 562. Consequently, we will consider expert opinion testimony to the extent that it assists us in resolving the issues presented by the instant case.

1. *Whether Petitioner Has Established That the Core Deposits Have an Ascertainable Value Separate and Distinct From Goodwill*

Our inquiry is primarily factual. We must decide whether the record provides sufficient evidence to permit amortization of the core deposit intangible under our opinion in *Citizens & Southern.* Respondent makes several arguments that the core deposit intangible is not separate and distinct from the goodwill of the What Cheer bank. On that issue, many of the same arguments respondent advances in the instant case were made in the *Citizens & Southern* case and were rejected. Nevertheless, before we turn to the other issues, we will briefly touch upon respondent's arguments in the instant case regarding the separateness of the core deposit intangible from goodwill.

Respondent argues that the value of the core deposits represents nothing more than the value flowing from the expectation that the What Cheer bank's customers will continue to do business with petitioner by supplying it with low cost funds. Respondent contends that the "inertia" of a bank's depositors, which causes them to leave funds on deposit for an ascertainable length of time and which we found in *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 499-500, to contribute to the value of the core deposit intangible is nothing more than the continuation of established customer relationships, which are the essence of goodwill. Because deposit relationships are terminable at will, respondent views the value attributable to such inertia as nothing more than the expected value of future patronage or renewal of previous business, or simply, goodwill. Respondent argues that petitioner is attempting to depreciate a part of the What Cheer bank's customer structure, which is an inseparable component of goodwill.

Respondent's arguments in the instant case, however, do not persuade us to reconsider our holding in *Citizens & Southern.* As we said in *Citizens & Southern Corp. v. Commissioner,*

The fact that a deposit account has no fixed termination date and is terminable at will does not as a matter of law prevent petitioner from factually showing that deposit base has an ascertainable cost basis separate and distinct from goodwill. * * * [91 T.C. at 486.]

Furthermore, mere inertia, which lasts for only a limited time, should not be equated with the continued patronage of a business over an indefinite period. As in *Citizens & Southern,* petitioner is not attempting to depreciate the value of the What Cheer bank's customer structure or the expected value of the continued patronage of the What Cheer bank's established clientele, 91 T.C. at 499; rather, it seeks to amortize only one separate component of the value petitioner acquired when it purchased the What Cheer bank, namely, the core deposits. While the What Cheer bank's customer structure may have had many more elements of value, which petitioner hoped to exploit, petitioner did not attempt to take those elements into account in calculating the amortization value of the deposit core. For instance, the prospect of selling as many banking services as possible to

the customers of the acquired bank was a significant consideration in petitioner's decision to acquire the What Cheer bank, but the potential value of such opportunity did not figure in the calculations with respect to the deposit core.

Respondent also suggests that petitioner's failure to separately value the core deposits in the initial phase of the acquisition, when it decided whether to pay the price Mrs. Baylor asked for the What Cheer bank in 1981, casts doubt on petitioner's effort to value and amortize the core after the acquisition was finalized in 1983. The record, however, shows that petitioner and its advisers considered the value of the What Cheer bank's core deposits in deciding to accept Mrs. Baylor's offer, and that acquiring the What Cheer bank's core deposits was one of the principal reasons that petitioner wished to purchase the What Cheer bank. Moreover, in *Citizens & Southern,* we concluded that, where the record showed that core deposits were considered in making the decision to go forward with an acquisition, the separate valuation of the core deposits prior to the transaction was not necessary in order for the taxpayer to be eligible for a subsequent amortization deduction. 91 T.C. at 494-495.

Respondent also points to petitioner's failure to obtain approval for its core deposit valuation from the Iowa Department of Banking and the FDIC as further evidence of the core's inseparability from goodwill. The bank regulators, however, rejected petitioner's attempt to include the core in its regulatory capital. As we stated in *Citizens & Southern,* adequacy of bank capital is defined in terms of assets which can be easily sold and which provide a suitable liquidity cushion. 91 T.C. at 497-498. Mr. Robert Storch, an official of the FDIC, testified that capital adequacy is not an income accounting concept, but a bank supervisory one. Accordingly, as the bank capital rules serve a special, limited purpose, whether a core deposit intangible is excluded from regulatory capital is irrelevant in determining whether the core deposit intangible is an amortizable asset for purposes of income accounting. *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 497-498.

We also note that Mr. Storch stated that the FDIC considered the core deposit intangible to be among the assets of a bank, and that its amortization was necessary in order to avoid distorting a bank's income. He testified that, in issuing BL-5-82, under which petitioner sought approval of its core deposit valuation, the FDIC sought to inform banks that they would be allowed to book a core deposit intangible as an asset with the consent of the FDIC. He stated that it was the position of the FDIC that a core deposit intangible could be booked as an asset if such asset was recordable under generally accepted accounting principles.

Respondent also suggests that, since petitioner did not report the core deposit intangible on its financial statements or regulatory reports, the core deposit intangible should be treated as goodwill. Petitioner, however, is a small bank which maintains its books under regulatory accounting principles, and does not maintain a separate set of books using generally accepted accounting principles, under which petitioner would have been able to recognize the core deposit asset. Accordingly, we hold that such circumstance is not an impediment to petitioner's amortization of the core deposits.

Respondent makes a number of other arguments that we considered and rejected in *Citizens & Southern* and, as we stated above, we see no reason for restating our conclusion with respect to such arguments in the instant case. We therefore hold that in the instant case the core deposit intangible is an asset separate and distinct from goodwill which petitioner may amortize if it shows that it has a limited life and ascertainable value. We will now turn to those issues.

### 2. *Whether Petitioners Have Proved That the Core Deposit Intangible Has a Limited Useful Life*

Petitioner calculated the life of the deposit core on the basis of the rate at which accounts in the core closed. Respondent criticizes petitioner's method of calculating the useful life of the deposit core, pointing out that the value of the core lay in the amount of funds held in the core, not in the number of accounts. Respondent contends that the rate

at which accounts close is not necessarily the same as the rate at which funds leave the deposit core, and that petitioner must show that the rate at which accounts close accurately measures the rate at which deposit dollars actually leave the core in order to establish the validity of such an indirect method of determining the life of the deposit base. Respondent points to the fact that the call reports of the What Cheer bank in the years prior to the acquisition show a marked movement of funds from low or no interest accounts to accounts paying higher rates, while the account closing data assembled by petitioner does not indicate that a fundamental shift in the deposit structure of the bank was occurring. Respondent's criticism echoes that which he made of the taxpayer's use of account closings to measure deposit runoff in *Citizens & Southern*. In *Citizens & Southern*, however, the taxpayer was able to show the validity of its method by followup studies which showed that the rate of account closings accurately predicted the runoff of deposits. 91 T.C. at 500-503.

In the instant case petitioner made no independent effort to confirm the validity of using account closures to measure the shrinkage of the deposit base. At trial, however, Mr. Robert McMahon, petitioners' expert and the accountant in charge of preparing petitioner's study, testified that the historical rate of account closures furnishes the most accurate and reasonable estimate of the life of the deposit core. We agree with Mr. McMahon's conclusion in the instant case and hold that account closings accurately reflected the expected life of the core.

Respondent also contends that petitioner's methodology is deficient because it used only a sample of closed accounts to determine attrition rates when it could have considered every account closure during the period examined. Respondent points out that, in *Citizens & Southern*, the taxpayer developed its attrition rates by taking into account every account closed during its test period, 91 T.C. at 470, 500, and that, because the What Cheer bank was so small, petitioner could easily have counted all of the closed accounts, rather than relying upon a sample. Respondent further argues that petitioner did not use statistically valid sampling techniques in arriving at its figures. Petitioners

contend that the sample results were accurate for three reasons: first, in developing its initial valuation, petitioner's outside accountants surveyed all account closures during the test period used in such study to develop attrition rates, and the results of the final study, based on a sample, were in line with the rates in the earlier study. Secondly, the rates determined in the final study were found by the What Cheer bank's management to be consistent with its experience. Finally, the sampling techniques of the final study were the same as those the accountants who prepared the study used for auditing purposes. We agree with petitioner that sufficient grounds exist in the instant case to uphold the accuracy of petitioner's methodology regarding account closings.[13]

Respondent also contends that petitioner's lifing analysis is not valid because closed accounts were not stratified by age and size to take account of differences in attrition rates on the basis of such variables. Respondent notes that the valuation methodology approved by this Court in *Citizens & Southern* involved stratification of accounts on such basis. 91 T.C. at 471. Petitioners point out that the number of closed accounts in the test period was not large enough to permit calculation of meaningful results using stratification and therefore the lack of account stratification did not prevent petitioners' expert from making accurate predictions. We agree with petitioners that the failure to stratify the closed accounts did not prevent petitioners' expert from calculating a reasonably valid attrition rate.

Accordingly, we conclude that petitioners have shown that the core deposit intangible has a limited useful life, the length of which has been calculated with reasonable accuracy, and turn to the valuation issue.

---

[13]We note that, in calculating the attrition rate for demand and NOW accounts, petitioner included in such category super NOW accounts, which we have found, for reasons discussed *infra*, are not includable in the core. We have examined the work papers of petitioner's study, however, and are satisfied that closures of super NOW accounts did not affect the calculation of the attrition rate for demand and NOW accounts.

3. *Whether the Values and Amortization Schedules Utilized in Calculating the Deprecation Deductions Were Reasonable*

Petitioner used the cost savings method to value the core deposit intangible, under which the value of the core is determined by reference to the reduction in cost realizable by using the core as a funding source rather than the next most costly such source. *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 498, 506. We previously have considered the use of the cost savings method in dealing with the valuation of the core deposit intangible, although cost savings was used as a secondary valuation tool. In our earlier cases, taxpayers have primarily relied upon the income method to value the core, which supported the deposit core's value according to the additional increment of income realizable from using the core to fund loans and investments. See *Colorado National Bankshares, Inc. v. Commissioner,* T.C. Memo. 1990-495, 60 T.C.M. 771, 792; P-H Memo T.C. par. 90,495, at 2399-2400. The cost savings method is somewhat simpler to apply than the income method, as it does not require a determination of the rate of return that will be earned on the bank's assets in order to arrive at a value for the core deposit intangible.

Valuation of the core deposit intangible under the cost savings method is accomplished in the following manner: deposits within the core are identified, based on their stability and insensitivity to fluctuations in market rates of interest. The cost of such deposits is then ascertained, taking into account both explicit interest paid plus the cost of providing services to such accounts, net of service fee income. The life of the deposit base is then calculated, based upon the rate of attrition of deposits within the base. The cost advantage of the deposit base is then found by comparing its cost to the cost of the alternative funding source, which is selected on the basis of its comparability to the deposit base on the basis of characteristics such as risk and expected life.. The net cost savings equals the avoided cost achieved by using the deposit base, instead of the alternative, as a funding source over the life of the deposit base, decreased by the income taxes payable upon the savings. The after-tax present value of such cost savings is

found by applying a discount factor, based upon the taxpayer's cost of capital, to the net cost savings projected in each year of the deposit core's life. The total stream of such cost savings, together with the tax savings obtained by amortizing the core, equals the value of the deposit core.

Respondent contends that the manner in which petitioner has executed each part of the methodology described above is defective. We will consider respondent's contentions regarding petitioner's implementation of each step of the method. While we hold that petitioner may calculate the value of the core deposit intangible under its cost savings methodology, we also hold that certain of the steps must be modified in order to arrive at a reasonable value for the core deposit intangible. See *Anselmo v. Commissioner*, 80 T.C. 872, 884-885 (1983), affd. 757 F.2d 1208 (11th Cir. 1985).

a. *Definition of the Deposit Core*

In defining the deposit core of the What Cheer bank petitioner included all deposits except for certificates of deposit over $100,000, internal accounts, and governmental funds. Such definition resulted in the inclusion of demand accounts, savings accounts, NOW accounts, super NOW accounts, money market deposit accounts, and certificates of deposit under $100,000, which comprised nearly all of the deposits in the What Cheer bank. Respondent contends that such a definition of the deposit core is overinclusive, and that it improperly takes into account deposits which are sensitive to interest rate changes and therefore do not offer an identifiable funding cost advantage over the true market alternative. Petitioners contend that such a definition is proper because the core deposit as so defined was stable and did not constitute "hot money," i.e., those deposits that are extremely sensitive to interest rate fluctuations and enter and leave a bank rapidly in response to rate shifts. Petitioners' position is that core deposits can include deposits that do not have regulated interest rate ceilings.[14]

---

[14] In the instant case, petitioner's only cost-related criterion for including deposits in the core was that they bear a rate below the alternative funding source used in the study. As discussed *infra*, because we do not find that petitioner used an appropriate alternative funding source in its study, we do not consider the relevance of whether deposits carry a rate of interest above or below the rate payable on such alternative in determining whether a deposit should be included in the core.

We agree with respondent that petitioners' definition of core deposits is overly broad.

In *Citizens & Southern,* we defined core deposits as "a relatively low-cost source of funds, reasonably stable over time, and relatively insensitive to interest rate changes." *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 465. See also *AmSouth Bancorporation & Subsidiaries v. United States,* 681 F. Supp. 698, 706 (N.D. Ala. 1988). The taxpayer in *Citizens & Southern* defined its core deposits as amounts in demand, NOW, and regular savings accounts, and excluded deposits not subject to regulated interest rate ceilings. 91 T.C. at 465, 472.[15] In *Citizens & Southern,* we did not consider the breadth of the core deposit definition because it was not contested by respondent.

The importance of interest rate insensitivity as a distinguishing feature of core deposits becomes apparent as we consider the manner in which the banking business operates. One of respondent's experts, Dr. Victor L. Andrews, the Mills Lane Professor of Banking and Finance at Georgia State University, testified that banks generally view deposits as their usual source of funds. The record in the instant case bears out Dr. Andrews' characterization of the banking industry's practice, as neither the What Cheer bank nor petitioner regarded anything other than deposits as their normal source of funds. Banks therefore will differentiate between types of deposits based on their cost. If deposits bear a market rate of interest and are sensitive to interest rate fluctuations, they offer no potential for extra-normal profitability and there is no potential for cost savings associated with them. If, however, deposits are insensitive to interest rate changes, they do offer the possibility of providing above-normal profits, and, accordingly, will command a premium in a sale transaction. Petitioners would have us expand the definition of core deposits beyond that utilized by the taxpayer in *Citizens & Southern.* We, however, decline petitioners' invitation in the instant case.

---

[15]See also *Colorado National Bankshares, Inc. v. Commissioner,* T.C. Memo: 1990-495.

The FDIC has defined core deposits as "demand and savings accounts," and the FDIC rejected petitioner's attempt to include certificates of deposit in the deposit core figure petitioner submitted for approval, requiring its recalculation without them, even though petitioner could show that the deposits were stable.

Petitioners contend that stability should be the principal criterion in the definition of core deposits, and have ignored altogether the requirement of interest rate insensitivity. Petitioners contend that as long as deposits are not "hot money," which is hypersensitive to interest rate shifts, they are includable in the core. Petitioners also contend that the What Cheer bank's deposits cost less than the alternative funding source proposed by petitioner, and therefore should be considered core deposits on such account. For reasons which will be discussed *infra*, however, we disagree.

Adjustable rate deposit accounts, such as certificates of deposit, money market deposit accounts, and super NOW accounts, were expressly created in order to allow banks to compete successfully for deposits against other financial intermediaries not bound by the interest rate ceilings applicable to banks. Money market and super NOW accounts were authorized pursuant to section 327 of the Garn-St. Germain Depository Institutions Act of 1982, Pub. L. 97-320, 96 Stat. 1501, which stated that such accounts were to be "directly equivalent to and competitive with money market mutual funds." Competitive pressures similarly led to the creation of certificates of deposit, which were designed to allow banks to retain funds which otherwise would be attracted to alternate instruments. E. Altman, Handbook of Financial Markets and Institutions 13-19 (6th ed. 1987). Dr. Andrews stated that such accounts are susceptible of rate competition among banks, as indicated by their frequent repricing. Inasmuch as such accounts were designed to be the interest rate sensitive and rate competitive products of banking, it is illogical to include them automatically in core deposits, a term defined to mean deposits which are not sensitive to interest rate changes.

Our holding in the instant case does not exclude the possibility that a taxpayer may show deposits in such accounts are in fact insensitive to interest rate changes. Nonetheless, the record in the instant case shows that the funds held in the What Cheer bank's super NOW, money market deposit, and certificate of deposit accounts actually were sensitive to interest rate changes. Mrs. Baylor testified that her customers were aware of and concerned with interest rates, and that she paid competitive rates on

deposits in order to retain their business. Inasmuch as there were 14 other banks within 25 miles of What Cheer, consistent with Mrs. Baylor's testimony, we conclude that competitive pressures would have influenced the rates paid on the What Cheer bank's deposits.

Dr. Andrews also constructed a chart from What Cheer's call reports which showed that deposits migrated over time from low or no interest accounts to higher yielding accounts.[16] For instance, individual, partnership, and corporate (IPC) demand deposits made up 26.74 percent of all deposits at the bank in 1978, but the percentage of deposits contained in them dropped as interest-bearing transaction accounts became available around 1980. By 1982, only 14.50 percent of the banks' deposits were in IPC demand accounts. At the time of the acquisition in May 1983, nongovernmental demand deposits comprised only $749,341 of the $7,229,086 on deposit in nongovernmental accounts, slightly over 10 percent of the total.[17] Furthermore, although super NOW accounts first were made available in January 1983, 47 Fed. Reg. 56321 (Dec. 16, 1982), $693,516 was deposited in such accounts by the date of the acquisition of the What Cheer bank.

Regular savings deposits similarly exhibited a marked decline as compared to other types of deposits offering more attractive interest rates. In 1978, IPC savings deposits comprised 22.48 percent of all deposits, but by 1981, their share had fallen to 15.16 percent.[18] Balances in savings deposits, as a percentage of nongovernmental deposits, continued to decline, totaling only $369,916 of the $7,229,086 on deposit in May 1983, approximately 5 percent of such deposits.

---

[16]The experience of the What Cheer bank regarding deposit shifts was by no means unique, and it appears that, during the time studied by Dr. Andrews, banks were experiencing a shift in deposits from low to high yielding accounts. For instance, a study by the Federal Reserve found that most of the deposits in money market deposit and super NOW accounts came from lower yielding bank accounts, rather than from other sources. Furlong, "New Deposit Instruments," 69 Fed. Res. Bull. 319, 322-323 (1983).

[17]The figures for deposits at the time of the acquisition are net of Government deposits and are taken from petitioner's valuation study.

[18]We note that the figures in the call reports reflecting savings deposits for 1982 possibly are inaccurate, as they fail to separately report balances in savings accounts and NOW accounts, instead lumping them together. Such deficiency in the data, however, does not appear to detract from Dr. Andrews' conclusion.

Interest rate sensitive products, on the other hand, increased their share of the bank's deposits during such time. In 1978, IPC time deposits, which included certificates of deposit, made up 48.86 percent of the bank's deposits, but by 1982, they had grown to 69.63 percent of deposits. On the date of the acquisition of the What Cheer bank, nongovernmental time deposits totaled $5,226,444, approximately 72 percent of the total of such deposits with the bank. We find particularly noteworthy that $1,066,849 of the deposits included by petitioner in the deposit core were held in money market accounts on that date, even though such accounts had only been authorized in December 1982, 5 months prior to the acquisition. 47 Fed. Reg. 53716 (Nov. 29, 1982). The migration of deposits from low to high yielding accounts indicates that such deposits were sensitive to interest rates, and, consequently, they do not fit the definition of core deposits.

Petitioner's valuation study attempted to show that What Cheer's deposits were not rate sensitive by comparing the rate of account runoff against market rates of interest. The comparison, however, did not show any marked correlation between the two, and the study merely concluded that the deposit base was insensitive to rate changes.[19] Dr. Andrews criticized the test and stated that the statistical method used was insufficient to prove insensitivity. Petitioner's method did not appear to take into account the possibility that the What Cheer bank kept its rate of attrition stable by paying market rates of interest to its depositors or that depositors did not close their old accounts when shifting funds to higher yielding alternatives. Given the clear evidence furnished by the call reports that total deposits were increasing during the years preceding the acquisition, but that funds were being drawn from low to high interest accounts, we hold that petitioners have not proved that the deposits without interest rate ceilings included in the deposit core were interest rate insensitive.

---

[19]Petitioner's study examined account closings in regular savings accounts and certificates of deposit for 4 years before the acquisition, but only examined closures of demand deposits and NOW accounts in the year preceding the acquisition. It is curious that petitioner's accountants did not study the accounts which would appear to be the most susceptible to erosion attributable to rate changes, as such accounts paid little or no interest.

To the contrary, it appears that the What Cheer bank was paying market interest rates on such deposits. Consequently, such deposits did not offer any cost advantage over other deposits which would justify payment of a premium by petitioners. At the time of the acquisition in May 1983, the What Cheer bank's money market and super NOW accounts paid interest at a rate of 8.5 percent, and its certificates of deposit under $100,000 paid an average interest rate of 10.39 percent. Readily available data published by the Federal Reserve show that, at such time, commercial banks were paying an average rate of 7.13 percent on super NOW accounts and 8.06 percent on money market accounts. Federal Reserve Statistical Release H6, Special Supplementary Table (July 15, 1983). Federal Reserve reports also show that rates paid by such banks on certificates of deposit ranged from 8.76 percent to 9.58 percent, depending upon the time to maturity of the certificate. Federal Reserve Statistical Release H6, Special Supplementary Table (July 15, 1983). The fact that the rates paid on such deposits by the What Cheer bank were higher than the industry figures published by the Federal Reserve suggests that the funds held in such accounts were not insensitive to interest rates and were not a source of funds obtainable at below market rates.[20] Furthermore, both of respondent's experts, based on their own analyses, concluded that the deposits of the What Cheer bank did not bear interest rates below those of alternate deposits. Consequently, we hold that even though such deposits were stable and did not constitute "hot money," they were not properly includable in the deposit core in the instant case.

Furthermore, the amount of the deposit base must be reduced for funds required to be held in reserve and the float on uncollected balances, which was not done in petitioner's original study. Such funds are not available to replace higher cost sources of funds, and so furnish no cost savings to the bank. See *Citizens & Southern Corp. v. Commissioner*, 91 T.C. at 471. At trial, petitioners' expert,

---

[20]Petitioners claim that the cost of the deposit base was low compared to a hypothetical alternative funds cost; however, as discussed below, we find that the alternative rate selected by petitioners is not the proper standard to use in determining whether the cost of the What Cheer deposits paid more or less than the market rate of interest.

Mr. McMahon, agreed that the deposit core should have been reduced to reflect such factors.[21]

b. *Cost of Deposit Core*

Once the deposit core has been defined, its cost to the bank, both in terms of explicit interest and the cost of services provided to depositors, called "implicit" interest, must be ascertained. At the time of the acquisition, the FDIC's regulations forbade payment of explicit interest on demand deposits, 12 C.F.R. sec. 329.2(a) (1983), so the What Cheer bank paid no explicit interest on such deposits. Rates on savings deposits and NOW accounts were subject to a ceiling of 5.25 percent. 12 C.F.R. sec. 1204.108(a) (1983) (NOW accounts); 12 C.F.R. sec. 329.6(c) (1983) (savings accounts). Consequently, the explicit interest costs incurred by the What Cheer bank on its deposit base must be determined with reference to such limitations.

Petitioner calculated the cost of implicit interest furnished depositors by allocating a portion of each category of expense incurred by the What Cheer bank to the deposit function. The maintenance costs of the deposit base were calculated based on allocations furnished by the What Cheer bank's management. The cost of deposit insurance was included in determining the maintenance cost of the deposit core. The allocation used by petitioner resulted in over half of the bank's operating expenses being allocated to deposits.

Respondent's expert, Dr. Edward J. Kane, the Everett D. Reese Professor of Banking and Monetary Economics at Ohio State University, objected to petitioner's allocation of expenses, concluding that, due to the jointness of production of a bank's services, accurate calculation of the amount of expense incurred in producing the services provided to any particular class of customers was very difficult, if not impossible. Dr. Kane noted that the banking industry had not been able to develop a satisfactory method of cost allocation, and that, therefore, manipulation of allocations in

---

[21]Mr. McMahon stated that taking into account reserve requirements for demand and other types of deposits would have reduced the core by 3 percent, and that taking float on uncollected balances into account would have further reduced the core by another 6 percent. Such adjustments must be taken into account in recalculating the value of the deposit core in the Rule 155 proceeding we order below.

order to artificially inflate or depress costs allocable to a particular bank function was not difficult. Dr. Kane concluded that the allocations made in the study appeared arbitrary, and that a survey based on the actual expenses incurred in servicing the deposit base would have provided better information as to the maintenance cost of the deposit core. We hold, however, that the allocation was made using the best information available at the time the study was done, and that the persons most likely to have had an accurate idea of the amount of expenses properly allocable to deposits were consulted in developing the allocation. A taxpayer is not required to use the most theoretically correct method in order to establish the amount of depreciation to which he is entitled; rather, his method must be reasonable. *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 514. Based on the record in the instant case, we hold that petitioner's cost allocation method is reasonable.

Petitioner's study, however, lumped together all costs attributable to the deposit function and did not break out the costs allocable to each type of account within the core. Because we have held *supra* that the types of deposits properly includable in the core must be limited, we will require petitioner to adjust its maintenance cost calculation to reflect the inclusion of only such maintenance costs as are attributable to the deposits remaining in the core and to eliminate costs allocable to noncore deposits.

The record shows, however, that the 1.284-percent maintenance rate originally calculated for the deposit core would not be an accurate representation of the level of expense incurred in servicing the redefined deposit base. Professor Kane, respondent's own expert, noted that maintenance costs on transaction accounts, such as checking accounts, generally were higher than on time deposits, such as certificates of deposit, and that, with respect to demand deposits, where payment of explicit interest is prohibited by law, competition among banks is based on the services provided to such accounts. Furthermore, petitioner's expert, Mr. McMahon, also testified that maintenance costs on transaction accounts, such as demand and NOW accounts, generally were higher than the costs incurred with respect to time deposits.

Accordingly, we hold that maintenance costs for the redefined deposit core should be a higher percentage of deposits than originally calculated. Petitioner originally allocated $89,969 of its 1982 operating expenses to the deposit core, and figured the rate of such costs as a percentage of the average balance of core deposits outstanding on December 30, 1982. The average balance on such date of demand, NOW, and regular savings deposits, which we have held properly includable in the core on such date, was $2,192,282.[22] Using our best judgment, we allow half of the expenses originally allocated to the core, or $44,985 ($89,969/2), to be allocated to the redefined core and find that maintenance costs as a percentage of such core equal 2.05 percent.[23] See *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930).

### c. *Effect of Banking Deregulation*

In order to take account of the effect of banking deregulation on the deposit core, petitioner assumed that the cost of the What Cheer bank's deposits would increase according to the Treasury debt yield curve as it stood on May 20, 1983. Petitioner assumed that most of the cost advantage of the deposit core would be eliminated between 1983 and 1986, and that the deposit core thereafter would pay a rate 1 percentage point below the rate it projected would be paid on short-term Treasury debt. Such assumption was the only effect of deregulation incorporated into petitioner's valuation study. Petitioner did not project an increase in the cost of maintaining the deposit base and assumed that maintenance costs would remain a constant percentage of core deposits over the life of the base. Furthermore, petitioner did not project any change in attrition rates over the life of the deposit base.

Respondent contends that petitioner's method of projecting the effect of deregulation is not appropriate because petitioner does not demonstrate a relationship between changes in the yields on Treasury debt and the cost of bank deposits. Drs. Kane and Andrews noted that the relation-

---

[22]Such figure does not include any balances in super NOW accounts, as such accounts were not available until January 1983, after the time as of which the expense rate was calculated.

[23]Such percentage is the same percentage as $44,985 is of $2,192,282, the average outstanding balances of the accounts properly includable in the core on Dec. 30, 1982.

ship between rates paid on certificates of deposit and U.S. Treasury debt of similar maturity were unstable. Therefore, they explained it was difficult to make predictions about the changes in bank interest rates based on the behavior of interest rates on Treasury debt. Dr. Andrews also stated that it was unreasonable to assume, as petitioner did, that interest rates would remain at the historically high levels of the early 1980s for the next 26 years.

Based on the redefined deposit core, which excludes deposits not having interest rate ceilings, however, at least a portion of petitioner's speculation concerning the future interest cost of the deposit core has been rendered moot. In 1983, the types of accounts properly includable in the deposit core were subject to interest rate ceilings, thus limiting the bank's interest rate costs. In the year of the acquisition, however, some increase in rates on core deposits was foreseeable, and so such increase properly could be taken into account in valuing the core deposit intangible. *Southern Bancorporation, Inc. v. Commissioner,* 847 F.2d 131, 137-138 (4th Cir. 1988), affg. a Memorandum Opinion of this Court.

Under section 326 of the Garn-St. Germain Depository Institutions Act of 1982, Pub. L. 97-320, 96 Stat. 1500, which took effect October 15, 1982, Congress directed that commercial banks be allowed to raise the interest rates payable on savings accounts to 5-1/2 percent by January 1, 1984. See 48 Fed. Reg. 50067-50068 (Oct. 31, 1983). Furthermore, under section 202 of the Depository Institutions Deregulation Act of 1980, Pub. L. 96-221, 94 Stat. 142, Congress ordered the removal of interest rate ceilings on all types of savings deposits by March 31, 1986. Consequently, the removal of savings deposit interest rate ceilings at such time was foreseeable in 1983. During the 1980s, however, Congress did not move to permit payment of interest on demand deposits. Therefore no basis exists for assuming that interest payments would be made on such deposits in valuing the deposit core.

It is difficult to say whether petitioner reasonably could have foreseen in 1983 whether interest rates on savings and NOW accounts would increase after the removal of interest rate ceilings on March 31, 1986. Petitioner's original as-

sumption that interest rates paid on the deposit core would increase was made on the basis of a deposit core containing interest rate sensitive deposits. Because we have decided that such deposits are not properly includable in the core, and have defined the core as being comprised of deposits not sensitive to interest rate changes, it appears that the grounds for petitioner's assumption as to future interest costs no longer exist. Consequently, we hold that petitioners have not established that the interest cost of the deposit base would rise to the levels predicted in the valuation study after removal of interest rate ceilings in 1986.[24]

### d. *Alternative Funding Rate*

The cost savings afforded by core deposits are ascertained by comparing their cost against that of the next most expensive source of funds available to the bank. Such alternative funding source is selected on the basis of its similarity to core deposits in terms of average balance size, remaining life, and insurability. *Citizens & Southern Corp. v. Commissioner*, 91 T.C. at 507. In prior cases in this Court involving core deposit issues, taxpayers have used the cost of rate sensitive deposits, such as money market certificates of deposit, in order to measure the cost savings afforded by the deposit base. *Citizens & Southern Corp. v. Commissioner*, 91 T.C. at 506-507;[25] *Colorado National Bankshares, Inc. v. Commissioner*, T.C. Memo. 1990-495, 60 T.C.M. at 786; P-H Memo T.C. par. 90,495, at 2393.

In the instant case, however, petitioner used the cost of unsecured debt with a maturity equal to the life of the deposit base, as calculated in its study. Petitioner solicited a quote from an investment bank in order to establish the rate of interest payable on such debt. The investment bank informed petitioner that such a debt issue would carry a 13-percent rate of interest, but also stated that the existence of a market for such an issue could not be guaranteed.

Respondent contends that petitioner's method of establishing an alternative funding rate is not valid because it

---

[24]Furthermore, there is no evidence in the record to suggest that rates on savings accounts actually did rise after the interest rate ceiling was removed.

[25]The taxpayer's expert in *Citizens & Southern* figured the cost savings of the deposit base using certificates of deposit because "insured certificates of deposit are the most realistic alternative to core deposits." 91 T.C. at 507.

does not represent the cost of a bank's actual alternative sources of funds. Respondent's experts advanced several reasons why an unsecured debt issue would not be an appropriate funding alternative to core deposits. Dr. Andrews testified that banks do not regard unsecured debt issues as a replacement for or alternative to insured deposits as a funding source for loans and investments. Such debt issues generally are used only to build a bank's capital to serve as a base for attracting deposits. The facts in the instant case bear out Dr. Andrews' conclusion. Mrs. Baylor testified that, during the time she ran the What Cheer bank, she would not have issued unsecured debt to make loans or purchase investments.

Moreover, petitioner itself never obtained funds to lend or invest through issuance of debt, using debt only to augment its capital. Petitioner's president testified at trial that, at the time of the acquisition, deposits constituted its source of funds for acquiring assets. Petitioner's position with respect to debt issuance was made quite clear in the acquisition of What Cheer bank. In the acquisition, petitioner attempted to avoid incurring debt. It sought to have the core deposit intangible booked as part of its regulatory capital so as to meet the minimum capital requirements set by the Iowa Department of Banking, and only took on debt indirectly through the issuance of preferred stock when such action was absolutely necessary to meet such requirement. Consequently, we fail to see how unsecured debt could have been an alternative to deposits as a source of funds for petitioner. We do not think it sufficient that such a debt issue constituted a theoretically possible alternative source, especially when it was not actually the next most expensive alternative to the core deposits.

Dr. Kane found an additional ground on which to question the validity of petitioner's alternative funding comparison. He pointed out that the rate paid on insured deposits is not comparable to the rate of interest payable on a commercial debt issue because Federal deposit insurance, and the regulatory requirements imposed on banks to qualify for it, essentially eliminate the risk of the deposit, which causes the rate of interest demanded by depositors to fall below what would be required on a comparable

uninsured investment. Dr. Andrews made the same point in his report. Even petitioners' expert witness, Mr. McMahon, conceded at trial that guaranteed debt is materially different from nonguaranteed debt, and that insured deposits pay a lower interest rate than uninsured ones. Respondent's expert, Dr. Kane, stated that at least a portion of the difference in rate paid on an uninsured debt instrument issued by a bank and an insured deposit taken by a bank is attributable to the credit enhancement of deposit insurance, which is neither a wasting asset, nor an attribute unique to core deposits. Dr. Kane concluded that comparison of the cost of unsecured debt to the cost of Federally insured deposits was unreasonable.

Petitioners contend that including the cost of Federal deposit insurance in the maintenance cost of the deposit base adequately accounts for the reduction in funding cost afforded by such deposit insurance. Petitioners, however, assume that the reduction in interest rate demanded by depositors on account of deposit insurance is exactly equal to the premium paid for such insurance. Petitioners have offered no evidence in support of such a proposition. To the contrary, Dr. Kane notes that the value of deposit insurance to a bank will vary with the "riskiness" of a bank. The ability of a "very risky" bank to offer deposit insurance will appreciably reduce the rate the bank would otherwise have to pay to attract depositors. On the other hand, if the bank is not risky, the funding cost reduction afforded by deposit insurance will not be as great. Consequently, even though the banks in the instant case were well run, petitioner cannot adequately control for the funding cost advantage provided by deposit insurance merely by taking its maintenance cost into account in figuring the cost of the deposit core.

We think that to properly measure the cost advantage of core deposits over rate sensitive alternative funding sources, an alternative funding source which has the same risk characteristics as the core deposits should be used. Although the alternative funding source selected by petitioner had the same life as the deposit core, such alternative did not have the same risk characteristics. We therefore will not allow it to be used to measure the cost savings furnished by

the deposit core. To eliminate any value attributable to Federal deposit insurance from the deposit core, we will allow petitioners to use only an alternative funding source with the same risk characteristics as the core deposits.

Dr. Kane suggests that use of insured noncore deposits as an alternative funding source would strip out the value of deposit insurance and thus produce a more accurate value for the cost savings afforded by the core. Therefore, we believe that interest rate sensitive deposits, such as certificates of deposit, to the extent otherwise comparable to the core, are the best alternative funding source to use in calculating the value of the deposit core. Based on petitioner's own practices and the normal practices of the banking industry, as outlined by Dr. Andrews, we believe that petitioner would view such deposits as the most natural alternative to the low-cost core deposits. Because the value of the What Cheer bank's deposit core for purposes of the instant case is equal to the cost savings petitioner would realize by utilizing such core as a funding source, as opposed to the alternate source, the cost to petitioner of such alternative deposits would be the best basis for developing the value of the core.

Petitioners argue that insured certificates of deposit were not comparable to the deposit core because they did not have 26-year maturities, i.e., the life petitioner calculated for the deposit core. We hold, however, that the term to maturity of a financial instrument is not decisive of comparability. The premise of the core deposit valuation is that funds will be left on deposit for ascertainable periods even though they may be withdrawn at will by depositors. The core deposit intangible derives its value from the inertia of depositors, rather than a bank's legal ability to retain deposits against the will of depositors.

Consequently, in deciding comparability, the actual life of a group of deposits, not its term to maturity, is the key characteristic. In deciding comparability, we therefore focus on the time over which the bank can be expected to have the use of the funds based on attrition data, rather than on the time when the instruments mature. If funds are likely to be left on deposit after the maturity of an instrument, such maturity has no practical effect on the ability of the

bank to use such funds, and therefore such maturity is not relevant to calculating the life of a group of deposits. Accordingly, where, based on attrition rates, funds in certificates of deposit can be expected to remain with a bank for a period similar to that of core deposits, the funds should not be disqualified as an alternative funding source simply because the individual certificates do not have the same time to maturity as the life of the core deposit intangible.

Having decided that interest sensitive deposits are the best alternative source of funds, we must look to the rate paid on such funds for purposes of comparison. The record, however, contains no evidence of the rates petitioner paid on interest rate sensitive deposits as of the time of the acquisition. Nevertheless, inasmuch as we are satisfied that such an alternative was available to petitioner, we may make a reasonable estimate of the cost of such alternative source based on such evidence as in the record. Cf. *Cohan v. Commissioner,* 39 F.2d 540 (2d Cir. 1930).

In his report, respondent's expert Dr. Kane concluded that, if the unsecured debt instrument used as petitioner's alternative funding source possessed the same risk characteristics as an insured deposit, the source would bear an interest rate of 11.2 percent. Respondent, in his post trial brief, requests that we hold that the alternative funding rate is no more than 11.2 percent. We agree, and, accordingly, we hold that the alternative funding cost should be 11.2 percent. Such evidence as is in the record suggests that 11.2 percent is a reasonable approximation of the cost of insured noncore deposits to petitioner at the time of the acquisition. Petitioner's study of the deposits of the What Cheer bank shows that insured certificates of deposit paid an average rate of 10.39 percent at the time of the acquisition. That provides a useful indication of what petitioner's cost would likely have been, as both petitioner and the What Cheer bank operated in the same general market and were in a similar competitive environment. Operating statistics of insured commercial banks in Iowa compiled by the FDIC for 1982 show that the cost factor for deposits, other than certificates of deposit over $100,000, for banks similar in size to petitioner was 10.33 percent.

When maintenance costs and the Federal deposit insurance premium are included, the actual overall cost would probably be quite close to 11.2 percent.

### e. *Cost Savings Reduced by Taxes*

Petitioner reduced the total cost savings afforded by the core deposits by the Federal, State, and local income taxes that would be levied upon them, yielding the net savings for each year over the life of the deposit base. Petitioner used a 48.7-percent tax rate to calculate the after-tax cost savings of the deposit base. Respondent does not object to such reduction, for, as Dr. Kane's report stated, "the bite that taxing authorities take must be discharged before income begins to accrue to a corporation's stockholders."

### f. *Discount Rate*

A discount rate is applied to the net cost savings yielded by the deposit core over its life in order to determine its present value. The present value of each year's cost savings, determined at the time the deposit core is valued, affords the basis for calculating the amount of amortization to be deducted in each year of the deposit core's life. *Citizens & Southern Corp. v. Commissioner*, 91 T.C. at 513-514.

In the instant case petitioner used a weighted average cost of capital equal to 7.667 percent as the discount rate. Such figure was calculated as the sum of the after-tax cost of long-term debt capital and after-tax desired rate of return on equity, weighted according to the relative percentages of debt, in the form of deposit liabilities, and equity funding petitioner's assets on the acquisition.[26] The debt cost used was the 13 percent rate quoted by the investment bank on the hypothetical debt issue.[27] The after-tax rate of return on equity was set at 20 percent, but the record does not show how such figure was derived, and petitioner's study describes it as a "desired" rate of return.

Respondent objects to petitioner's discount rate, claiming that it is too low and therefore overstates the present value of the savings yielded by the deposit core. Respondent

---

[26]On the acquisition date, 92.5 percent of petitioner's assets were funded by debt, i.e., deposits, while 7.5 percent were funded by equity.

[27]On an after-tax basis, such rate equaled 6.669 percent.

argues that use of the interest rate on the hypothetical debt issue in figuring the discount rate is inappropriate. Respondent's expert, Dr. Kane, concluded that, because the purpose of the valuation was to calculate the payment made by petitioner's stockholders for the stream of cost savings generated by the What Cheer bank deposit base and because the cost savings of the core deposits accrue to petitioner's equity holders, the rate of interest payable to a hypothetical class of debtholders was conceptually irrelevant. Furthermore, long-term debt like the hypothetical alternative funding source did not form part of petitioner's capital at the time of the acquisition, and so the interest rate payable on such debt did not affect petitioner's cost of capital at such time.

Dr. Kane elaborated that, under corporate finance theory, the appropriate discount rate to use would be the marginal capitalization rate, which equals the weighted average of the returns paid on the mix of debt and equity actually used to finance the acquisition of the What Cheer bank. In the instant case, the cash used to acquire the What Cheer bank came from petitioner's equity capital. No debt was issued to finance the acquisition, although petitioner subsequently issued preferred stock after the acquisition in order to satisfy the minimum capital requirements of Iowa banking regulators.

Accordingly, we find that the appropriate discount rate is petitioner's after-tax return on equity as of the time of the acquisition. We previously have approved of the use of an after-tax rate of return on equity as an appropriate discount rate. *Colorado National Bankshares, Inc. v. Commissioner,* T.C. Memo. 1990-495, 60 T.C.M. at 785, 793, 59 P-H Memo T.C. par. 90,495, at 2389, 2400-2401. At trial, however, petitioner's expert, Mr. McMahon, testified that it was very difficult to determine the after-tax rate of return on equity demanded by petitioner's shareholders, and that the 20-percent figure used in the study was a conservative estimate of such rate. Dr. Kane also testified that it was very difficult for small banks, such as petitioner, to determine an appropriate capitalization rate. Consequently, we hold, under the facts of the instant case, that the 20-percent after-tax rate of return on equity used in

petitioner's study is the best available information regarding the discount rate to use in valuing the deposit core and therefore uphold petitioner's use of that rate.

### g. *Tax Savings Included as Part of Value of Deposit Base*

Under petitioner's valuation methodology, the present value of the cost savings yielded by the core deposits acquired from the What Cheer bank equaled $581,490 on the valuation date. In figuring the final value of the core deposits, however, petitioner included the value of the tax deductions attributable to the amortization of the deposit core, which increased the value of the core to the final figure of $906,470.

Respondent contends that inclusion of such tax deduction is an unwarranted inflation of the value of the deposit core. Petitioners contend that the purpose of including the tax deduction is to calculate the after-tax value of the deposit core, the consideration of which was approved in *Citizens & Southern.* Applying our precedent,[28] we find that petitioner may include in its valuation the tax savings generated by the core.

Petitioners, however, must establish that the tax savings are susceptible of reasonable calculation. Petitioner's calculation of the savings in the instant case varies from that used by the taxpayer in *Citizens & Southern.* In that case, the after-tax value of the deposit core was figured by applying a 20-percent effective tax rate to its projected income stream. 91 T.C. at 506-507. In the instant case, petitioner adopted a two-step approach to calculating the effect of taxes on the deposit core. In the first step, the cost savings generated by the deposit core were reduced by a marginal tax rate of 48.7 percent in each year of its life. In the second step, the tax savings produced by the deposit core depreciation deductions were added to the value of the cost savings generated by the core to yield the overall value for the core. Petitioner's method takes account of the tax effect of depreciation in reducing the effective rate of tax

---

[28]The Supreme Court also has recognized that the tax savings generated by an asset can be an identifiable component of its value, and that sophisticated taxpayers may consider such savings in assigning a value to property. "We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." *Frank Lyon Co. v. United States*, 435 U.S. 561, 580 (1978).

below the marginal rate by adding back some of the tax taken out in the first part of the calculation. Petitioner's calculations therefore accomplish the same end as the application of an effective tax rate to the deposit core cost savings approved in *Citizens & Southern.* Accordingly, we hold that petitioner's method is a proper calculation of the tax savings in the instant case.

### 4. *Whether Petitioner May Amortize the Deposit Core Intangible on an Accelerated Basis*

The final issue for our decision is whether petitioner may depreciate the deposit core on an accelerated basis. Petitioners contend that, in each year of the life of the deposit core, the present value of the cost savings attributable to the core in such year may be deducted. Petitioners contend that present value is properly calculated as of the valuation date of the core in 1983. Such a calculation results in accelerated amortization of the core because the cost savings in earlier years are greater than the savings in later years due to the effect of discounting. Respondent contends petitioner's amortization schedule is not proper. Respondent contends that depreciation deductions should be keyed to the attrition of the core, which would result in straight-line depreciation because such attrition is assumed to be constant under petitioner's valuation methodology.

Although the straight line method generally is used to depreciate intangibles, petitioner may use an accelerated method if it can show that such method results in a more reasonable depreciation allowance. *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 512. A method other than straight line is appropriate when, considering the facts of the case, it "results in a fair allocation of the basis of the asset to periods in which income is realized." *Citizens & Southern Corp. v. Commissioner,* 91 T.C. at 512 (quoting *Schneider v. Commissioner,* 65 T.C. 18, 32 (1975)). In *Citizens & Southern,* we found the present value approach to calculating each year's amortization produced a reasonable allowance for depreciation. 91 T.C. at 512-514. Accordingly, we hold that petitioner may base its depreciation

allowance on the present value, on the acquisition date, of the cost savings yielded by the deposit core.[29]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[29]Respondent has not challenged petitioner's amortization of the cost of its valuation study over the useful life of the deposit core. Accordingly, petitioner may take such cost into account in computing its depreciation allowance.