T.C. Memo. 1997-1


UNITED STATES TAX COURT


WAL-MART STORES, INC. AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27022-93.                    Filed January 2, 1997.

        Ps operate retail department stores and clubs.
Ps' accounting records set forth each store/club's
inventory, and Ps count each store/club's inventory
during the year to verify the records' accuracy.  In
order to reflect the "shrinkage" of inventory at
yearend caused by theft, breakage, and clerical errors
occurring after a count, Ps estimate this shrinkage
based on gross sales.  Ps' inclusion of the estimates
in costs of goods sold reduces their gross income.
        <u>Held</u>:  Ps' method of estimating inventory
shrinkage at yearend is permissible because the method:
(1) Conforms as nearly as may be to the best accounting
practice in the trade or business and (2) clearly
reflects income.

Alexander Zakupowsky, Jr., Frederick Brook Voght, Jean Ann Pawlow, and Carol Ann Johnson, for petitioners.

Albert L. Sandlin, Jr., Thomas R. Ascher, James P. Dawson, and Martin L. Osborne, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Wal-Mart Stores, Inc., & Subsidiaries, petitioned the Court to redetermine respondent's determination of deficiencies in their Federal income tax.  Respondent determined the following deficiencies:

| Taxable Year Ended | Deficiency |
| --- | --- |
| Jan. 31, 1984 (1983 taxable year) | $9,937,545 |
| Jan. 31, 1985 (1984 taxable year) | 4,084,255 |
| Jan. 31, 1986 (1985 taxable year) | 9,381,626 |
| Jan. 31, 1987 (1986 taxable year) | 8,206,962 |

Following concessions by the parties, we must decide whether petitioners' estimates of inventory shrinkage at yearend are permissible.  We hold they are.  Section references are to the Internal Revenue Code in effect for the subject years.  Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar amounts are rounded to the nearest dollar.  The term "shrinkage" refers to the excess value of book inventory over actual inventory.  The term "overage" refers to the excess value of actual inventory over book inventory.  The term "physical inventory" refers to the counting of the goods that are actually in inventory.

FINDINGS OF FACT

I.  Background

A.  General Information

Some of the facts have been stipulated and are so found. The stipulated facts and exhibits submitted therewith are incorporated herein by this reference.  Petitioners comprise an affiliated group of corporations that use an accrual method of accounting for financial accounting and tax purposes.  They filed Federal consolidated income tax returns and amended Federal consolidated income tax returns for the subject years.  Their common parent is Wal-Mart Stores, Inc. (Parent).  Parent's principal place of business was in Bentonville, Arkansas, when it petitioned the Court.

At all relevant times, Kuhn's-Big K Stores Corp. (Kuhn's) and Big K Edwards, Inc. (Edwards), were two of Parent's subsidiaries, and Sam's Wholesale Clubs (Sam's) was one of Parent's divisions.  (We hereinafter use the name "Wal-Mart" to refer collectively to Parent (without regard to Sam's), Kuhn's, and Edwards.  We hereinafter use the term "petitioners" to refer collectively to Wal-Mart and Sam's.)

Sam's operated its stores (clubs) on a discount warehouse basis.  Wal-Mart operated its stores as mass discount retailers. Each Wal-Mart store contained up to 37 departments, and, in the aggregate, these departments carried a wide range of merchandise, including home furnishings, electrical appliances, automotive and

hardware items, electronics, toys, candy, and pet supplies, as well as apparel for men, women, boys, and girls.

Inventory is petitioners' most essential and valuable asset, and it is critical to their success. Petitioners strive to maintain enough inventory to satisfy their customers' needs, while at the same time minimizing the dollar amount of their inventories. One measure of the effectiveness of Wal-Mart's inventory management is its impressive rate of inventory turnover (sales/inventory). Wal-Mart's inventory turned over 4.5 times in its 1983 taxable year, while the average turnover for Wal-Mart's competitors was approximately 2.8 times. Another indication of the effectiveness of Wal-Mart's inventory management was that many other companies (both domestic and foreign) sought advice from Wal-Mart on inventory management.

B. Respondent's Adjustments

Respondent issued petitioners two notices of deficiency, one for their 1983 and 1984 taxable years and the other for their 1985 and 1986 taxable years. Both notices reflected an increase to petitioners' ending inventories on account of respondent's disallowance of their estimated inventory shrinkage.[1] Respondent

---

[1] The notice for 1983 and 1984 disallowed shrinkage estimates for Wal-Mart only. The notice for 1985 and 1986 disallowed shrinkage estimates for Wal-Mart and Sam's.

determined that petitioners' ending inventories as reported understated their taxable income by the following amounts:[2]

| Taxable Year | Understatement |
|---|---|
| 1983 | $24,276,994 |
| 1984 | 7,837,122 |
| 1985 | 20,394,840 |
| 1986 | 1,196,045 |

The shrinkage disallowed by respondent relates to the period of time referred to by the parties as the "stub period". In general, the stub period is the time between the date of the last physical inventory prior to the taxable yearend and the taxable yearend. In some cases, Wal-Mart took a physical inventory in January and booked the inventory in February of the next year. In those cases, the stub period is the time between the date of the physical inventory immediately prior to the January physical inventory and the taxable yearend. In other cases, Wal-Mart booked two consecutive January inventories in February. In those cases, the stub period is the time between the first January inventory and the taxable yearend following the second January inventory. In the case of a new store for which a physical inventory was not taken before the taxable yearend, the stub period is the period beginning with the date of the store opening and ending with the taxable yearend.

---

[2] Respondent also determined that part of these understatements stemmed from petitioners' miscalculation of a cost complement. The parties have settled their disagreements with respect to this calculation, and it is not at issue herein.

C.  Scope of Petitioners' Operations

Wal-Mart is one of the largest operators of mass merchandise retail stores in the United States.  During the subject years, the numbers of Wal-Mart's stores and Sam's clubs were as follows:

| Taxable Year | Wal-Mart | Sam's |
|---|---|---|
| 1983 | 642 | 3 |
| 1984 | 745 | 11 |
| 1985 | 859 | 23 |
| 1986 | 980 | 49 |

Many of these stores were open to the public 24 hours a day.

During the subject years, Wal-Mart purchased and sold products labeled with the manufacturer's name (name brands), as well as products with its own name brand.  The dollar amounts of petitioners' purchases and the retail values of its net sales were as follows:

| Year | Purchases Wal-Mart | Purchases Sam's | Sales Wal-Mart | Sales Sam's |
|---|---|---|---|---|
| 1983 | $3,543,245,308 | $41,192,081 | $4,566,514,170 | $37,364,011 |
| 1984 | 4,808,957,832 | 232,156,657 | 6,068,673,313 | 221,585,916 |
| 1985 | 5,855,108,264 | 749,927,690 | 7,501,658,005 | 776,483,444 |
| 1986 | 8,037,262,151 | 1,608,040,382 | 9,933,879,035 | 1,670,806,324 |

A typical Wal-Mart store averaged 53,000, 55,000, 57,000, and 59,000 square feet in the respective taxable years, and petitioners' total square footage of retail space increased from 27.7 million in the 1983 taxable year to 63 million in the 1986 taxable year.  Wal-Mart's stores carried between 60,000 and

90,000 specific types of merchandise (stock keeping units or SKU's).[3]  Sam's clubs carried between 3,500 and 5,000 SKU's.

Wal-Mart received approximately 80 percent of its merchandise through petitioners' distribution system.  Wal-Mart's distribution centers increased from 6 in 1984 to 10 in 1987. In the later year, petitioners' total distribution center space was over 7 million square feet, and each distribution center received and shipped in excess of 30 million cases of merchandise a year, the equivalent of 96 trailer loads per working day.

## II.  Petitioners' Inventory Practice

### A.  Inventory Systems in General

Inventory accounting requires allocating each period's cost of goods available for sale between:  (1) Cost of goods sold and (2) the value of ending inventory.  Taxpayers may use either the perpetual or periodic inventory system for this allocation. Under both systems, the cost of each purchase is recorded contemporaneously with the purchase, and the revenue from each sale is recorded contemporaneously with each sale.  But for these similarities, recording differs depending on whether the taxpayer uses a periodic or a perpetual system.

Under the periodic system, an entry is not made to record the quantity or cost of an item of merchandise when it is sold. A physical count is generally performed at yearend to ascertain

---

[3] In general, identical units are one SKU's, and each different size and brand is a different SKU.

the items in and value of the ending inventory. The cost of goods sold is the residual amount. No distinction is made between the cost of the goods that were actually sold during the period and the expense of shrinkage.

Under the perpetual system, the cost and/or quantity of goods sold are contemporaneously recorded at or about the time of sale. Thus, the perpetual system continuously reveals the cost and/or quantity of goods sold since the beginning of the current period and the cost and/or quantity of goods that are (or should be) on hand at any given time. Physical inventory counts are performed periodically to confirm the accuracy of the inventory as stated in the taxpayer's books, and adjustments are made to the books to reconcile the inventory stated therein with the actual inventory.

B. Petitioners' Inventory Accounting Method

Petitioners maintained a perpetual inventory system. Wal-Mart used the Last In, First Out (LIFO) method of identifying items in ending inventory, see sec. 1.472-1, Income Tax Regs., and the retail method of pricing inventories, see sec. 1.471-8, Income Tax Regs.[4] Wal-Mart determined the cost of the LIFO inventories using the dollar value LIFO method, see sec. 1.472-8, Income Tax Regs., and it valued any increase in inventory quantities based on the cost of the earliest acquisitions during

_____

[4] Many of Wal-Mart's competitors also used the retail inventory method to account for their inventories.

the year, see sec. 1.472-2, Income Tax Regs. At the end of each month, Wal-Mart applied a cost complement to convert its inventory balances from retail to deemed cost. Wal-Mart's internal monthly financial statements reported inventory shrinkage (both estimated and verified) as an increase to cost of goods sold.

Sam's did not use the retail method. Sam's used the First In, First Out method of identifying items in ending inventory.

C. Cycle Counting

Petitioners did not count the actual yearend inventory at each of their stores. They counted each store's inventory at various times during the year (referred to as cycle counting). The use of cycle counting, and the absence of a physical count at yearend, is common in petitioners' industry. Petitioners used this technique during the subject years because they were unable to physically count the inventories at all of their stores/clubs on the last day of the taxable year. Cycle counting was also advantageous to them because it was less disruptive to business operations, and it allowed management to receive information throughout the year on the effectiveness of internal operations and changes in external behavior. The continuous flow of information facilitated management's response to shrinkage trends on a timely basis.

During the subject years, petitioners' independent auditors were Ernst & Young (E&Y). E&Y advised Wal-Mart that it

could use cycle counting because: (1) Wal-Mart had accurate retail accounting records, (2) Wal-Mart had retained independent counting services to work with Wal-Mart's internal audit department, and (3) Wal-Mart's previous physical inventories had not required significant changes to the retail records. E&Y certified that petitioners' financial statements for the subject years (which included the shrinkage estimates) conformed with Generally Accepted Accounting Principles (GAAP), issuing unqualified opinions to that effect for each of the years. E&Y had been periodically reviewing petitioners' methodology for accounting for shrinkage, including the accrual of the shrinkage estimate during the stub period, and E&Y had never recommended that petitioners change their method of accounting for shrinkage.

D. Physical Counts

The amount of shrinkage or overage was verified by petitioners when the inventory on hand was counted. In general, Wal-Mart counted each store's inventory approximately every 11 to 13 months. In the case of new stores, petitioners did not count the inventory until the store had been open for at least 6 months. Petitioners also did not count inventory in the months of November, December, and the first week in January. During November and December, Wal-Mart was focusing on the Christmas season, which is one of the busiest times of the year, and its inventory was at a maximum. During the first week of January, Wal-Mart's employees were recuperating from the Christmas season,

and they were responding to the return of merchandise from customers. Wal-Mart's inventory was generally at its lowest during the month of January.

Wal-Mart counted the inventory at some of its stores during the last 3 weeks in January. The results of some of these inventories were posted in January of the same taxable year, while the results of most of these inventories were posted in February of the subsequent taxable year. The ending inventory for the year of the counts was not corrected for verified shrinkage for those stores inventoried in January and posted in February. The following chart shows the number of inventories taken in January, the number of January inventories posted in January, and the number of January inventories posted in February for the taxable years at issue:

| Year | Number of January Inventories | Posted in January | Posted in February |
|------|-------------------------------|-------------------|--------------------|
| 1983 | 39 | 39 | - 0 - |
| 1984 | 73 | 9 | 64 |
| 1985 | 73 | 1 | 72 |
| 1986 | 93 or 95 | - 0 - | 93 or 95 |

During the subject years, the highest percentages of physical inventories took place from March through September.

In general, it takes 4 to 6 weeks to prepare a store for inventory. Forty-five days prior to a scheduled count, Wal-Mart's internal audit department would send a preparation package to the store for completion before the inventory was

taken. Completion of the package by the store was designed to ensure accuracy and consistency in the count and reconciliation with book inventory. The package included detailed instructions for store preparation to ensure an efficient count. The package included 13 schedules that were reviewed or completed prior to the day of the count.

Persons involved in a count included a team of independent counters (18 to 40 individuals) and representatives from Wal-Mart's loss prevention department (one to two individuals), internal audit department (one to three individuals), and operations division (one to two individuals). E&Y was also present at the inventories of randomly selected stores to test the count's accuracy by recounting results. All salable merchandise in a store was counted by the independent counters on the day of the physical inventory, and they based the count on the inventory's retail value.

Wal-Mart took inventory while the stores were open to customers. Each store count took a full day, commencing at approximately 8 a.m. and concluding at approximately 6 p.m. Thereafter, while still at the store, the physical count team reconciled the physical count to the book inventory. These reconciliations were reviewed by petitioners' internal audit department on a future date. Due to the time necessary to review the reconciliations, petitioners did not book the results of a physical inventory until the next month.

Sam's physical inventory procedure was essentially the same as Wal-Mart's procedure, except that Sam's conducted its inventories before business hours and the physical count was completed within 4 to 5 hours. In addition, two inventories were usually taken during the taxable year at each of Sam's clubs, and the items, rather than retail values, were counted. Physical counts were sometimes taken at Sam's in January, and the results of physical inventories at Sam's were booked the day after the physical inventory. Unlike the records of Wal-Mart, petitioners kept records for Sam's that listed the quantity and cost of items in inventory on any given date.

In addition to the physical inventories performed at each club, Sam's personnel routinely performed item audits on specific products held in inventory. In an item audit, Sam's personnel counted the goods on hand for a particular SKU's, and they reconciled the count with the club's stock status report. Any discrepancy was immediately booked. Item audits were performed daily or weekly at the club manager's discretion.

## III. Accounting for Shrinkage

### A. Shrinkage in General

Inventory shrinkage occurs daily and is an inherent cost of the retail business. Causes of shrinkage include theft, damage, breakage, spoilage, and bookkeeping errors. Although shrinkage cannot be eliminated entirely, it can be minimized through methods that include the use of loss prevention

equipment, employee involvement and screening, prosecutions for theft, security devices, training of security personnel, and effective control systems for paperwork, bookkeeping, and accounting. Shrinkage is particularly high around the holiday seasons such as Christmas and Easter.

B. Wal-Mart's Response to Shrinkage

In the early 1980's, prior to the subject years, Wal-Mart modified its computer system to improve the accuracy of its inventory accounting. Wal-Mart employed various other techniques to reduce shrinkage and overage during the subject years, such as closed-circuit camera systems, burglar alarms, and close scrutiny over the hiring and performance of employees.[5] In the latter regard, Wal-Mart tried not to hire applicants who might be inclined to commit theft, and Wal-Mart focused on employee training to reduce bookkeeping errors. Each store manager was also evaluated in part on his or her ability to reduce shrinkage, and employees at stores that reported excessive shrinkage or overages were not eligible for a bonus. Store managers with higher than expected shrinkage were required to attend internal seminars on shrinkage, and they were subject to demotion or termination if the high shrinkage continued.

Shrinkage reduces profits and was viewed by petitioners during the subject years as reflecting poor management and

---

[5] Sam's employed similar measures.

adversely affecting employee morale. Petitioners aimed to reduce shrinkage, and they devoted extensive resources to the mitigation and monitoring of it. Petitioners' management discussed shrinkage weekly among themselves, and they regularly discussed the subject with the audit committee of the board of directors, as well as the regional managers, district managers, and store managers.

### C. Petitioners' Monthly Shrinkage Estimates

Wal-Mart estimated shrinkage for each store for the period between the physical inventory and the end of the taxable year by multiplying a retail shrinkage rate (stated as a percentage of sales) by the store's sales for the period between the physical inventory and the end of the taxable year. For new stores, Wal-Mart estimated shrinkage based on a fixed rate established by its senior management. In the 1983 and 1984 taxable years, the retail shrinkage rate for new stores was 3 percent of sales. In the 1985 and 1986 taxable years, the rate was 2 percent of sales. Wal-Mart used the fixed rate from the date the store opened until the date that the first inventory was taken at the store.

After Wal-Mart took the first inventory at a store, it computed a shrinkage rate for that store by dividing the store's shrinkage at retail, as verified by the first inventory, by the store's sales for the period starting with the date the store opened and ending on the inventory date. The shrinkage rate, as computed, was subjected to the imposition and application of

certain floor and ceiling percentage limitations that were established by Wal-Mart's senior management, and that are discussed further below. After Wal-Mart took a second inventory at the store, it computed the shrinkage rate for that store similarly to the method described above, except that it used the shrinkage as verified by both the first and second inventories, and it used the sales for the period starting with the date the store opened and ending on the date of the second inventory. The floor and ceiling limitations described below were also applied to this rate. After Wal-Mart took a third inventory at the store, it computed a shrinkage rate for that store in a fashion similar to that of the first 2 years, except that it used the shrinkage as verified by the first, second, and third inventories, and it used the sales for the period commencing with the date the store opened and ending on the date of the third inventory. This shrinkage rate, as computed, was subjected to the floor and ceiling limitations described below.

After Wal-Mart took the fourth and each subsequent inventory, the retail shrinkage rate was based on a rolling average of the historical shrinkage over the last three inventories of the store. The rate was computed by dividing the amount of shrinkage at retail, as verified by the current inventory and the preceding two inventories, by the sales for the period commencing with the date of the third preceding inventory and ending on the current inventory date. This shrinkage rate,

as computed, was subjected to the floor and ceiling limitations described below.

The floor and ceiling percentage limitations mentioned above were internal guidelines set forth in memoranda prepared by Wal-Mart's senior management. These guidelines were followed by all of Wal-Mart's stores. Wal-Mart's internal audit department recommended the amount of a ceiling and floor limitation to the controllers and vice presidents of the respective operating divisions based on a weighted 5-year average, and they, in turn, recommended the guidelines for these limitations to Wal-Mart's president. Wal-Mart's president was the ultimate setter of these guidelines, and, once set and implemented, these guidelines were effective until revised through the procedure used to establish them. The floor and ceiling percentage limitations were applied as follows: (1) If the computed shrinkage rate was below the floor, the rate was adjusted upward to equal the floor; (2) if the computed shrinkage rate exceeded the ceiling, it was adjusted downward to equal the ceiling; (3) if the computed shrinkage rate was an overage, the rate was replaced by the floor. In practice, the ceiling was seldom applied, and the floor was applied more often. As one example of the application of the floor and ceiling percentage limitations, the following table contains information from the 1986 taxable year that illustrates how a computed average shrinkage rate was adjusted:

| Store | Computed % | Applied % | % Applied |
|-------|------------|-----------|-----------|
| 201 | -1.08 shrinkage | -1.08 | Computed |
| 397 | -3.90 shrinkage | -3.85 | Ceiling |
| 531 | -0.27 shrinkage | -1.00 | Floor |
| 782 | +0.32 overage | -1.40 | Floor |

Sam's consistently determined shrinkage projections for its clubs by multiplying a fixed rate of .2 percent by monthly sales.  None of the clubs, including new clubs, applied a floor or ceiling percentage limitation to the .2-percent rate.  The .2-percent rate was determined by petitioner's senior management on the basis of their analysis of historical results from warehouse operations.  Sam's shrinkage estimates are a smaller part of overall annual shrinkage because Sam's warehouse format allows it to continuously take item physical inventories in addition to taking complete physical inventories twice a year.

Sam's underestimated shrinkage.  Sales during the physical inventory cycle for Sam's, expressed in thousands of dollars, were $597,954 for 1985 and $1,314,344 for 1986.  Shrinkage during the physical inventory cycle for Sam's, expressed in thousands of dollars, was $567 for 1985 and $4,669 for 1986.  Sam's shrinkage as a percentage of sales for the physical inventories taken during 1985 and 1986 was .27% (($567 + $4,669)/($597,954 + $1,314,344)).

D.  Adjustment of Monthly Estimates

Petitioners adjusted their inventory accounts to reflect the results of each physical count of a store or club.  Each time

petitioners took a physical count, they adjusted any over- or under-estimate of shrinkage, so that their books and records reflected inventories on hand as verified by the physical count. This was a continuous process throughout the year, as stores and clubs were physically counted in the cycle procedure.

E.  Yearend Allocations and LIFO Effects

Wal-Mart estimated shrinkage for each store, not for each department within each store.  At the end of each subject year, Wal-Mart aggregated the estimate for shrinkage for the stub period as reported in its records for all of its stores. Wal-Mart then allocated this aggregate estimated shrinkage to each department on the basis of the relative amount of all shrinkage verified during the year for each department as reported in the December purchase recap report.[6]  At the end of each taxable year, Wal-Mart allocated the consolidated ending inventory (net of shrinkage), as reported in the general journal, among each of its departments.[7]  For the 1984, 1985, and 1986

---

[6] Purchase recap reports were prepared monthly, and they listed beginning inventory at retail, purchases at cost and retail, sales at retail, markdowns at retail, and ending inventory at retail.  The inventory amounts shown in the monthly purchase recap reports were stated net of shrinkage (overage) as determined from physical inventories taken from the beginning of the year to date.  The shrinkage (overage) determined from the physical inventory was included in the purchase recap report when the inventory was completed, including verification and recording in the books.  The shrinkage (overage) reported in the purchase recap report was reported on a departmental basis from the physical counts of the departments.

[7] Wal-Mart recorded purchases, sales, and related

(continued...)

taxable years, the allocation was made on the basis of the relative value of ending inventory in each department (net of shrinkage as allocated) as reported in the yearend purchase recap report. In petitioners' 1983 taxable year, the allocation was made on the basis of the results of physical inventories taken during the month of January 1984. A separate allocation in the same manner was made for the stores of Parent, Kuhn's, and Edwards.

Parent, Kuhn's, and Edwards each had its own LIFO pools. Petitioners made separate LIFO computations for each of these entities. Petitioners separately recorded shrinkage as verified by physical counts by department for Parent, Kuhn's, and Edwards. Petitioners also allocated aggregate estimated stub period shrinkage separately to each of the entity's departments. Petitioners did not allocate an estimate of shrinkage to pools at the individual store level. Petitioners did not make yearend allocations and reconciliations or LIFO computations for individual stores. Yearend allocations and LIFO computations were performed on a division-wide basis.

Petitioners reported the same shrinkage for both financial and tax purposes. For purposes of preparing financial statements

[7](...continued)
information in the general journal. The general journal contained information on a store basis and contained basically the same accounts for each store. The general journal contained the records of the total shrinkage as verified by physical count and estimated shrinkage by store, but not by department.

and the Federal income tax return, petitioners reported shrinkage on an aggregate basis.  Other large retail businesses, in addition to Wal-Mart, estimate shrinkage for the stub period. The practice of estimating shrinkage as a percentage of sales is prevalent in the retail industry.

OPINION

I.  Overview

We must decide whether petitioners' estimates of inventory shrinkage at yearend are permissible.  In Dayton Hudson Corp. & Subs. v. Commissioner, 101 T.C. 462 (1993), we held that a taxpayer was entitled to use an estimate of yearend shrinkage if the taxpayer's method of accounting for its inventory was "sound".  In the instant case, respondent asks us to reconsider our holding in Dayton Hudson.  We will not do so.  We adhere to our opinion in Dayton Hudson Corp. & Subs. v. Commissioner, supra, for the reasons stated therein.  We will not disturb petitioners' method of accounting for their inventories, including their estimates of shrinkage at yearend, if the method is "sound".  Stated differently, petitioners will prevail if they prove that their inventory method meets the following two-prong test:  (1) It conforms as nearly as may be to the best accounting practice in the trade or business and (2) it clearly reflects income.  Sec. 471(a);[8] see also Thor Power Tool Co. v.

---

[8] Sec. 471(a) provides:

(continued...)

Commissioner, 439 U.S. 522, 531-532 (1979); Dayton Hudson Corp. &
Subs. v. Commissioner, supra; sec. 1.471-2(a)(1) and (2), Income
Tax Regs.  We analyze these prongs seriatim, and we set forth our
analysis below.  Before doing so, however, we pause to summarize
the qualifications of the experts.

During the cases in chief, petitioners called two
witnesses whom the Court recognized as experts, and respondent
called three.  We are given broad discretion to evaluate the
cogency of each expert's analysis and to weigh it accordingly.
See Trans City Life Ins. Co. v. Commissioner, 106 T.C. 274, 301
(1996).  We must evaluate and weigh each expert's opinion in

---

[8](...continued)
Whenever, in the opinion of the Secretary the use of
inventories is necessary in order clearly to determine
the income of any taxpayer, inventories shall be taken
by such taxpayer on such basis as the Secretary may
prescribe as conforming as nearly as may be to the best
accounting practice in the trade or business and as
most clearly reflecting the income.

The Commissioner has prescribed rules under sec. 471(a) for
taxpayers like petitioners that employ a perpetual inventory
system.  In pertinent part, sec. 1.471-2(d), Income Tax Regs.,
provides:

Where the taxpayer maintains book inventories in
accordance with a sound accounting system in which the
respective inventory accounts are charged with the
actual cost of the goods purchased or produced and
credited with the value of goods used, transferred, or
sold, calculated upon the basis of the actual cost of
the goods acquired during the taxable year (including
the inventory at the beginning of the year), the net
value as shown by such inventory accounts will be
deemed to be the cost of the goods on hand.  The
balances shown by such book inventories should be
verified by physical inventories at reasonable
intervals and adjusted to conform therewith.

light of his or her qualifications and with regard to all other evidence in the record. Id.; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991); Parker v. Commissioner, 86 T.C. 547, 561 (1986). We are not bound by an expert's opinion, especially when it is contrary to our own judgment. Trans City Life Ins. Co. v. Commissioner, supra at 302. If we believe it is appropriate to do so, we may adopt an expert's opinion in its entirety, or we may reject it in its entirety. Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938); see Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980). We may also choose to adopt only parts of an expert's opinion. Parker v. Commissioner, supra at 562.

The Court recognized Robert M. Zimmerman, petitioners' first expert, as an expert on shrinkage in the retail industry, as well as on matters of GAAP. Mr. Zimmerman has been a certified public accountant (C.P.A.) since 1959, and he has worked for a national accounting firm for 15 years as a partner and/or director, specializing in the retail industry and directing the firm's operations therein. Mr. Zimmerman consults currently in the retail industry, and he has written repeatedly on the subject of retail accounting and financial control. Mr. Zimmerman holds an undergraduate degree in accounting and a master's degree in taxation, both from New York University.

The Court recognized petitioners' second expert, Thomas E. Doerfler, as an expert on statistics. Dr. Doerfler has

consulted on the subject of statistics for over 25 years, and he is currently employed as a senior consultant in that area at a diversified international management and technology consulting firm.  Dr. Doerfler holds an undergraduate degree in mathematics from the University of Dayton and two graduate degrees (M.S. and Ph.D) in statistics from Iowa State University.  He has previously appeared before this and other Courts as an expert on statistical issues involving sampling and estimation.

Respondent's first expert, Steven Elliott Fienberg, was recognized by the Court as an expert on statistics.  Dr. Fienberg is a professor at Carnegie-Mellon University, where he teaches statistical science at both the undergraduate and graduate level. Dr. Fienberg holds a Ph.D in statistics from Harvard University, and he has previously testified as an expert in Federal, State, and local courts.  Dr. Fienberg is currently the president of the international society for Bayesian analysis, and he chairs the committee of presidents of statistical sciences.

The Court recognized respondent's second expert, David W. LaRue, as an expert in financial, tax, and inventory accounting.  Dr. LaRue, an associate professor at the University of Virginia, holds a Ph.D in taxation and accounting from the University of Houston.  He specializes in the fields of Federal taxation and accounting, and he has written repeatedly on those subjects.

Respondent's third expert, James Earnest Wheeler, was recognized by the Court as an expert in financial and tax accounting. Dr. Wheeler is a professor of accounting at the University of Michigan, and he holds a Ph.D. in accounting from the University of Illinois. Dr. Wheeler specializes and teaches in the fields of Federal taxation and accounting, and he has written frequently on those subjects.

The Court also recognized as experts two other witnesses called by petitioner during rebuttal; namely, Charles Bates and James Bradow. Both of these witnesses were qualified as experts for the sole purpose of rebuttal. Dr. Bates was recognized as an expert on tax accounting for purposes of rebutting Dr. Fienberg. He is a principal with KPMG Peat Marwick, heading its economic analysis group with a particular focus on statistical application to the field of economics (econometrics). He has a master's and a Ph.D in economics from the University of Rochester. Mr. Bradow was recognized as an expert in econometrics for purposes of rebutting Dr. Wheeler. Mr. Bradow is a C.P.A. and a partner of E&Y.

## II. Best Accounting Practice

Petitioners contend that their method of estimating shrinkage conforms to the best accounting practice in the industry. Respondent alleges to the contrary. Respondent argues that the retail industry does not have "one per se industry standard for estimating shrinkage" because other retailers use

variations of petitioners' method, rather than strictly following it. According to respondent, Wal-Mart's competitors in the retail industry use different historic periods to ascertain their shrinkage rates, and they adjust these rates differently than the ceiling and floor levels used by Wal-Mart. Respondent also argues that petitioners' shrinkage estimates do not conform to GAAP for the reasons stated by Dr. Wheeler. Respondent adds that petitioners' financial statements as a whole may have satisfied GAAP, but that their estimates of shrinkage do not. Respondent contends that E&Y was able to certify the subject statements without qualification because petitioners' shrinkage estimates were immaterial from a financial point of view. Respondent alleges that materiality is a financial accounting concept that does not apply to tax accounting.

The Supreme Court has indicated that the phrase "best accounting practice in the trade or business" is synonymous with GAAP. Thor Power Tool Co. v. Commissioner, 439 U.S. at 531; see also Hachette USA, Inc. v. Commissioner, 105 T.C. 234, 247 (1995), affd. 87 F.3d 43 (2d Cir. 1996). Thus, petitioners' method of accounting for their inventories will satisfy the first prong of our two-prong test if it conforms to GAAP. We believe it does. Petitioners' estimate of stub period shrinkage as a percentage of sales is a widely accepted industry practice. Petitioners consistently followed this practice, and they utilized the estimates resulting therefrom in their financial

statements.  Petitioners' financial statements were certified by E&Y as conforming to GAAP without qualification.

Respondent challenges the accuracy of petitioners' financial statements and contends that E&Y's certification does not pertain to the estimates of shrinkage.  We disagree.  Each of the statements is accompanied by E&Y's unqualified certification that E&Y has examined the financial statements in accordance with generally accepted auditing principles, and that the statements present the financial position of petitioners in conformance with GAAP.  Respondent invites the Court to focus on the accounting concept of materiality and conclude that E&Y was able to render an unqualified opinion even though petitioners' estimates of inventory shrinkage were improper.  We will not do so.  We do not find that petitioners' inventory accounting method was out of compliance with GAAP.  Petitioners' witness James A. Walker, Jr., a C.P.A. and Wal-Mart's current senior vice president/comptroller, testified that Wal-Mart's method of accounting for shrinkage conformed with GAAP.  Respondent did not persuasively challenge Mr. Walker's testimony, and we find that his testimony was consistent with the testimony of Robert Lundgren.  Mr. Lundgren is also a C.P.A, and he is the partner of E&Y who directed the audit of Wal-.Mart for the relevant years and gave the approval for the firm's opinion on the financial statements.  To the extent that Dr. Wheeler

testified that petitioners' inventory method did not comply with GAAP, we are unpersuaded by that testimony.

Petitioners' shrinkage methodology is supported by FASB Statement of Concepts No. 6 (Statement No. 6). In relevant part, Statement No. 6 states:

> 26. An asset has three essential characteristics: (a) it embodies a probable future benefit that involves a capacity * * * to contribute directly or indirectly to future net cash inflows, (b) a particular entity can obtain the benefit and control others' access to it, and (c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred.
>
> *     *     *     *     *     *     *
>
> 33. Once acquired, an asset continues as an asset of the entity until the entity collects it, transfers it to another entity, or uses it up, or some other event or circumstance destroys the future benefit or removes the entity's ability to obtain it.

Petitioners' method of accounting for shrinkage comports with Statement No. 6 because petitioners adjusted their inventories, which were their largest asset, to reflect the value of the merchandise that was on hand at yearend. If petitioners had not made these adjustments, the value of their ending inventories would have been overstated by the value lost through shrinkage. Merchandise that is not available for sale to customers does not "contribute * * * to future net cash inflows" or provide a "benefit".

We also are guided by the retail industry's accounting practice. In the absence of specific guidance, the generally

accepted standard for a trade or industry may be established by reference to a common practice followed by members of that trade or industry. See sec. 1.471-2(a)(1), Income Tax Regs. (inventories must conform to the best accounting practice in the trade or business). Petitioners' methodology for estimating stub period shrinkage is consistent with and comparable to the best practice used in the retail industry. Like most major retailers, petitioners use cycle counting, which is widely accepted in the retail industry. Petitioners' physical inventory process is strictly and carefully conducted and reviewed by independent counting services, petitioners' internal auditors and loss prevention department, and independent auditors. Petitioners' competitors also estimate shrinkage as a percentage of sales. Estimating shrinkage for the stub period as a percentage of sales is the best practice available in the industry. It is also relevant that petitioners used the same shrinkage estimates for reports issued to the Securities Exchange Commission.

We conclude that petitioners' method of accounting for their inventories, including their estimates of shrinkage at yearend, conforms as nearly as may be to the best accounting practice in the trade or business. We so hold, and we turn to the second prong.

III.  Clear Reflection of Income

Inventory accounting is governed by sections 446 and 471. Section 471 prescribes the general rule for inventories. The

regulations thereunder follow the statutory text in stating that a method of accounting for inventory "must conform as nearly as may be to the best accounting practice in the trade or business," and "must clearly reflect the income."  Sec. 1.471-2(a)(1) and (2), Income Tax Regs.

Section 446(a) contains the general rule for tax accounting.  Section 446(a) states that the accounting method used to compute taxable income generally must be based on the method of accounting used to compute book income.  When the accounting method used to compute taxable income does not clearly reflect income, section 446(b) gives the Commissioner broad authority to prescribe a method that does clearly reflect income. Thor Power Tool Co. v. Commissioner, supra at 532; Commissioner v. Hansen, 360 U.S. 446, 467 (1959); Ford Motor Co. v. Commissioner, 71 F.3d 209 (6th Cir. 1995), affg. 102 T.C. 87 (1994); see also sec. 1.446-1(a)(2), Income Tax Regs. ("no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income").  The Commissioner's exercise of authority under section 446(b) is given "much latitude" and cannot be disturbed unless "clearly unlawful". Thor Power Tool Co. v. Commissioner, 439 U.S. at 532-533; Lucas v. American Code Co., 280 U.S. 445, 449 (1930); see also United States v. Catto, 384 U.S. 102 (1966); Schlude v. Commissioner, 372 U.S. 128, 133-134 (1963); American Auto. Association v. United States, 367 U.S. 687, 697-698 (1961); Automobile Club of

Mich. v. Commissioner, 353 U.S. 180, 189-190 (1957); Brown v. Helvering, 291 U.S. 193, 203 (1934). Taxpayers challenging the Commissioner's authority must prove that the Commissioner's determination is "clearly unlawful" or "plainly arbitrary". Thor Power Tool Co. v. Commissioner, supra at 532-533. The Commissioner's authority under section 446(b) encompasses overall methods of accounting, as well as specific methods utilized to report any item of income or expense. Id. at 531; Ford Motor Co. v. Commissioner, 102 T.C. at 100; Prabel v. Commissioner, 91 T.C. 1101, 1112-1113 (1988), affd. 882 F.2d 820 (3d Cir. 1989); sec. 1.446-1(a), Income Tax Regs.

The fact that the Commissioner possesses broad authority under section 446(b) does not mean that the Commissioner can change a taxpayer's method of accounting with impunity. See, e.g., Prabel v. Commissioner, supra at 1112-1113. Thus, for example, if a taxpayer uses a method of accounting that clearly reflects income, the Commissioner may not require a change to another method merely because the Commissioner believes that the latter method will reflect income more clearly. Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367 (1995); Auburn Packing Co. v. Commissioner, 60 T.C. 794 (1973); Garth v. Commissioner, 56 T.C. 610 (1971); see also St. James Sugar Co-op, Inc. v. United States, 643 F.2d 1219 (5th Cir. 1981); Photo-Sonics, Inc. v. Commissioner, 357 F.2d 656, 658 (9th Cir. 1966), affg. 42 T.C. 926 (1964); Bay State Gas Co. v. Commissioner, 75 T.C. 410, 417

(1980), affd. 689 F.2d 1 (1st Cir. 1982).  Likewise, we have allowed the use of an accounting method that was challenged by the Commissioner, when the taxpayer's method clearly reflected income and the Commissioner's method did not.  See Rotolo v. Commissioner, 88 T.C. 1500, 1514 (1987).  We also have allowed the consistent application of accounting methods that were authorized by the Code or the underlying regulations.  See RLC Indus. Co. & Subs. v. Commissioner, 98 T.C. 457, 491-492 (1992), affd. 58 F.3d 413 (9th Cir. 1995).

When a taxpayer challenges the Commissioner's authority under section 446(b), we inquire whether the accounting method in issue clearly reflects income.  The answer to this question does not hinge on whether the taxpayer's method is superior to the Commissioner's method, or vice versa.  Id. at 492; see also Brown v. Helvering, supra at 204-205.  Instead, the answer must be found by analyzing the unique facts and circumstances of the case.  Ansley-Sheppard-Burgess Co. v. Commissioner, supra; Peninsula Steel Prods. & Equip. Co. v. Commissioner, 78 T.C. 1029, 1045 (1982).

Although it is not dispositive of our analysis, we believe that a critical fact to consider is whether the taxpayer is consistently utilizing a recognized method of accounting that comports with GAAP, and that is prevalent in the industry. See Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 354 (1st Cir. 1970), affg. T.C. Memo. 1969-79; RLC Indus. Co. & Subs.

v. Commissioner, supra at 490. We recognize that the treatment of an item for financial accounting and Federal income tax purposes does not always mesh, and that an accounting method that is acceptable under GAAP may be unacceptable for Federal income tax purposes because it does not clearly reflect income. Thor Power Tool Co. v. Commissioner, supra at 538-544; see also Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120, 128 (1991); UFE, Inc. v. Commissioner, 92 T.C. 1314, 1321 (1989); Sandor v. Commissioner, 62 T.C. 469, 477 (1974), affd. 536 F.2d 874 (9th Cir. 1976); Peninsula Steel Prods. & Equip. Co. v. Commissioner, supra. All the same, the regulations under section 446(b) contemplate that a method of accounting "ordinarily" will clearly reflect income when it "reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business". Sec. 1.446-1(a)(2), Income Tax Regs.

In this regard, we believe that the instant case falls within the contemplation of section 1.446-1(a)(2), Income Tax Regs. Petitioners consistently calculated their shrinkage estimates under a methodology that comported with GAAP. Under this methodology, they generally estimated shrinkage every month based on a 3-year rolling average, which was revised after every actual count. They adjusted any prior under- or over-estimate of shrinkage each time they counted their inventory so that their

books and records reflected the amount of inventory on hand as verified by the count.

A comparison of the total annual shrinkage recorded in petitioners' books (booked shrinkage) to the total shrinkage verified by actual count (verified shrinkage) during each of the years demonstrates that petitioners' method of estimation was reasonable. The following table compares booked shrinkage as a percentage of sales for the annual accounting period to verified shrinkage as a percentage of sales for the period between the physical inventory and the immediately preceding physical inventory.

### Shrinkage as a Percentage of Sales

| Year | Booked | Verified |
|------|--------|----------|
| 1983 | 1.47 | 1.48 |
| 1984 | 1.11 | 1.06 |
| 1985 | 1.36 | 1.37 |
| 1986 | 1.00 | 1.00 |

Although this comparison matches shrinkage for the physical inventory cycle to shrinkage for the taxable year, which is a different period, we believe that this comparison is appropriate under the facts herein. Both periods cover the period from the beginning of the taxable year to the physical inventory dates, and both amounts of shrinkage relate to sales for the period over which the shrinkage is measured. Moreover, the combination of the monthly estimates for the period from the beginning of the taxable year to the physical inventory date, taking into account the adjustments made at the time of the physical counts, reflects

the actual shrinkage for the year through the physical inventory date.  For the period from the beginning of the year to the date of the physical inventory, the estimated shrinkage combined with the part of the physical inventory adjustment attributable to the current year was the amount of actual shrinkage for that period as verified by the physical count.  This was so without regard to any difference between the shrinkage estimate and the actual shrinkage for the period.

We recognize that the period over which petitioners' shrinkage can be known with a higher degree of certainty is the period from physical inventory to physical inventory; i.e., this is the period over which the amount of shrinkage can be verified by physical count.  Any analysis of this period alone, however, is inappropriate because it ignores an important part of petitioners' method of accounting; namely, the adjustment that is made on the last day of that cycle when the book inventory is adjusted to the physical count.  Yet, if this adjustment is made, the analysis is unhelpful to us in determining the reasonableness of the stub period shrinkage estimate because, at the time of the physical count, petitioners' method of accounting is as precise as the physical count.  Accordingly, any analysis of the physical inventory cycle alone either ignores a fundamental part of petitioners' method of annual accounting (i.e., the reconciling adjustment booked at the time of the physical count) or shows that the method is accurate at the time of the physical count.

Neither of these analyses properly evaluates the stub period estimate.

By comparing the unadjusted results from physical inventories to the adjusted book amounts, the verification provided by the physical counts helps test the overall accuracy of petitioners' entire method of accounting for shrinkage, as it affects petitioners' inventory balances and annual determination of income. As shown in the above table, petitioners' shrinkage adjustment to inventories for each taxable year reasonably represents the amount of shrinkage verified by physical counts taken in the same year. In the 1986 taxable year, the numbers are the same. In the 1983 and 1985 taxable years, the numbers are within .0001 percent. In both 1983 and 1985, the amounts booked were less than the amount verified by the physical counts. Only in the 1984 taxable year did the amount booked exceed the amount verified by physical count, and that overstatement was only .0005 percent. These modest differences indicate that petitioners' method of accounting for shrinkage produced reasonable results. Respondent's determination, by contrast, would have petitioners omit shrinkage estimates for the subject years in the respective amounts of $33.6 million, $40.2 million, $62.1 million, and $67.9 million.

The second way in which the reasonableness of petitioners' shrinkage estimates can be seen is by understanding the relationship between shrinkage and sales. Respondent relies on

Dr. Fienberg's testimony to argue that such a relationship does not exist. We do not find this testimony to be persuasive. We read the record to support a finding of a relationship between shrinkage and sales under which a store's shrinkage will increase or decrease in accordance with its sales. An increase in sales, for example, results in an increase in purchases, and, as purchases rise, so do the goods lost in shipment or through paperwork errors. An increase in sales results in more inventory being placed on the shelves for sale, and, as the shelf inventory increases, so do the goods lost through breakage, theft, and erroneous price changes. An increase in sales results in greater customer traffic in the store, and, as more customers enter the store, the ratio of sales personnel to customers declines, making it more difficult to detect theft. An increase in sales results in the employment of additional sales personnel, and, as sales personnel increase, so does employee theft.

With this relationship in mind, we find that the reasonableness of petitioners' shrinkage estimates is seen further by comparing: (1) The retail value of shrinkage estimates for the stub period to the verified shrinkage for the same period and (2) the individual stub period estimates to the shrinkage that was attributable to the stub period and that was verified by a physical count in the next year.[9] The verified

[9] We compare the following year's physical inventory because stub period shrinkage is verified through physical inventories
(continued...)

shrinkage in the stub period can be fairly approximated by multiplying the verified shrinkage by the ratio of (i) stub period sales to (ii) sales for the entire physical inventory cycle.  The following table shows this analysis:

### Verified Shrinkage Allocable to Stub Period
#### (in thousands of dollars)

Stub period sales

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | $2,394,894 | $3,207,316 | $4,147,484 | $5,457,379 | $15,207,073 |
| Kuhn's | 230,542 | 299,992 | 353,714 | 424,967 | 1,309,215 |
| Edwards | 112,265 | 150,491 | 157,650 | 182,945 | 603,351 |
| Total | 2,737,701 | 3,657,799 | 4,658,848 | 6,065,291 | 17,119,639 |

Sales between physical inventories that include stub period

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | $4,084,989 | $5,063,087 | $6,951,462 | $8,908,722 | $25,008,260 |
| Kuhn's | 389,005 | 465,129 | 551,540 | 656,671 | 2,062,345 |
| Edwards | 190,890 | 244,489 | 266,793 | 296,036 | 998,208 |
| Total | 4,664,884 | 5,772,705 | 7,769,795 | 9,861,429 | 28,068,813 |

Stub period sales as percent of sales between physical inventories

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | 58.6 | 63.3 | 60.0 | 61.3 | 60.8 |
| Kuhn's | 59.3 | 64.5 | 64.1 | 64.7 | 63.5 |
| Edwards | 58.8 | 61.6 | 59.1 | 61.8 | 60.4 |
| Overall | 58.7 | 63.4 | 60.0 | 61.5 | 61.0 |

Total verified shrinkage

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | $40,663 | $67,543 | $68,542 | $ 99,253 | $276,001 |
| Kuhn's | 5,532 | 8,159 | 6,100 | 7,302 | 27,093 |
| Edwards | 3,298 | 3,558 | 3,353 | 4,312 | 14,521 |
| Total | 49,493 | 79,260 | 77,995 | 110,867 | 317,615 |

---

[9](...continued)
taken in the following period.  For example, the physical inventory results for the stub period that ended Jan. 31, 1984, were reflected in the physical inventories taken in the 1984 taxable year.

Verified shrinkage allocated to stub period on basis of percent of sales in stub period

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | $23,829 | $42,755 | $41,125 | $60,842 | $168,551 |
| Kuhn's | 3,280 | 5,263 | 3,910 | 4,724 | 17,177 |
| Edwards | 1,939 | 2,191 | 1,982 | 2,665 | 8,777 |
| Total | 29,048 | 50,209 | 47,017 | 68,231 | 194,505 |

We now compare the stub period estimates for each year to the verified shrinkage allocable to the stub period as it was reflected in the previous table.

### Comparison of Verified Shrinkage to Shrinkage Estimates
### (in thousands of dollars)

Verified shrinkage allocated to stub period on basis of percent of sales in stub period

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | $23,829 | $42,755 | $41,125 | $60,842 | $168,551 |
| Kuhn's | 3,280 | 5,263 | 3,910 | 4,724 | 17,177 |
| Edwards | 1,939 | 2,191 | 1,982 | 2,665 | 8,777 |
| Total | 29,048 | 50,209 | 47,017 | 68,231 | 194,505 |

Stub period shrinkage estimated

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | $27,983 | $33,996 | $54,178 | $60,197 | $176,354 |
| Kuhn's | 4,059 | 4,056 | 5,777 | 5,339 | 19,231 |
| Edwards | 1,556 | 2,151 | 2,185 | 2,364 | 8,256 |
| Total | 33,598 | 40,203 | 62,140 | 67,900 | 203,841 |

Over (Under) Estimated

|  | 1983 | 1984 | 1985 | 1986 | Total |
|---|---|---|---|---|---|
| Parent | $4,154 | $(8,759) | $13,053 | $(5,707) | $2,741 |
| Kuhn's | 779 | (1,107) | 1,867 | 615 | 2,154 |
| Edwards | (383) | (40) | 203 | (301) | (521) |
| Total | 4,550 | (9,906) | 15,123 | (5,393) | (4,374) |

As illustrated in the second table, our retrospective allocation of the shrinkage verified by physical count results in higher or lower shrinkage for each stub period than the shrinkage estimates at issue herein. We believe that this should be expected, however, because Wal-Mart did not have the benefit of

hindsight in estimating shrinkage. It also did not have the results of the subsequent inventories that are used in this comparison when it made its estimates. All the same, we believe that our comparison of Wal-Mart's estimates with those made with the benefit of hindsight helps demonstrate that Wal-Mart's method is reasonable. Wal-Mart's estimation procedure resulted in Parent's stores underestimating shrinkage in 2 years (1984 and 1986) and overestimating shrinkage in 2 years (1983 and 1985). Similarly, Kuhn's and Edwards underestimated shrinkage in some years and overestimated shrinkage in other years.

We conclude that Wal-Mart's shrinkage estimates clearly reflect income, and that Wal-Mart has met the second prong of our two-prong test. We so hold.[10] Because respondent has determined to the contrary, we reverse her determination.

IV.  Sam's

The correlation of shrinkage to sales supports Sam's use of estimates. The reasonableness of Sam's shrinkage estimates for the 1985 and 1986 taxable years is evident from the data. During those years, petitioners verified shrinkage through the physical inventories of Sam's in the amount of $5.236 million. Over the same period, Sam's recorded sales of $1.912 billion. Thus, Sam's shrinkage for the 2-year period was approximately .27 percent of sales, or slightly higher than the .2-percent rate

---

[10] We note that Dr. LaRue has not persuaded us that we should hold otherwise.

actually used.  We conclude that Sam's shrinkage estimates were permissible, and we so hold.

In reaching all of our holdings herein, we have considered all arguments made by respondent for contrary holdings and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.